# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| SHAWN JUAREZ CAMPOS a/k/a | ) | |
| ASCENCION JUAREZ CAMPOS | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:07-0029 |
| | ) | Judge Trauger |
| MTD PRODUCTS, INC. | ) | |
| d/b/a Cub Cadet, a Delaware Corporation, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

## MEMORANDUM

Pending before the court are the defendant's Motion for Summary Judgment on Grounds of Unforeseeable Product Alteration (Docket No. 58), the defendant's Motion to Exclude the Proposed Opinion Testimony of Stuart Statler (Docket No. 56), the plaintiff's Motion in Limine to Exclude Mention of Alcohol and the plaintiff's related Motion to Strike (Docket Nos. 51 and 96).[1]  For the reasons discussed herein, the defendant's Motion to Exclude will be granted, the defendant's Motion for Summary Judgment will be denied, the plaintiff's Motion in Limine will be granted in part and denied in part, and the plaintiff's Motion to Strike will be denied as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

This case concerns an August 19, 2006, riding mower accident that rendered the plaintiff a

---

[1]The defendant's Motion for Protective Order (Docket No. 112) is pending before Magistrate Judge Griffin.  Also, on February 16, 2009, the plaintiff filed a Motion for Sanctions (Docket No. 126), to which the defendant has not yet responded.

1

paraplegic.[2]  On September 9, 2005, the plaintiff, Shawn Campos, purchased a new Cub Cadet Z-Force 50 personal riding mower ("the mower") on a payment plan.  The mower was manufactured by the defendant MTD Products ("MTD").  The mower has a "zero-turning radius design" and has a single, gasoline engine.  While much of the power necessary to operate the mower is provided by gasoline, the power to drive the rear wheels of the mower is provided by two separate and independent transmissions, sometimes referred to as "hydrostatic transmissions."  That is, one transmission powers the left rear wheel and the other powers the right rear wheel.  Both transmissions in the mower contained a special lubricant fluid that was installed prior to sale.

Several key points regarding Campos' ownership, maintenance and use of the mower prior to the accident are undisputed: (1) that Campos "maintained custody and control" of the mower; (2) that Campos did not perform maintenance, add any fluid, or make any kind of change to the mower; (3) that Campos never let anyone else service the mower; and (4) that Campos never had any operational or mechanical problems with the mower.

In the late afternoon on August 19, 2006, Campos was riding the mower in his yard in Carthage, Tennessee.  After making several passes around the yard, as Campos was driving the mower up a hill with an approximately fifteen-degree incline, the mower "jerked" and tipped over 180 degrees rearward toward Campos, pinning Campos, face down, with the mower on his torso

_____

[2]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 60, 104, and 110) and related affidavits and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

and lower body.  (Docket No. 60 Ex. A.)  A neighbor who had seen the accident, Joshua Lambert, ran to the scene with a friend, and they lifted the mower off Campos and also called for an ambulance.  At Campos' instruction, Lambert also telephoned a woman, presumably Campos' wife, and told her of the accident.  An ambulance arrived shortly thereafter and took Campos to a local hospital, from which he was subsequently transferred by "LifeFlight" helicopter to Vanderbilt University Medical Center.  As noted above, the accident has rendered Campos a paraplegic, unable to move from the waist down.

After the accident, without riding the mower again or performing any service on the mower, Campos gave the mower to another individual, Jeff Reece, who took over the payments on the mower.  After receiving the mower from Campos, Reece subsequently informed Campos that the mower was damaged.  While it is unclear how long Reece had possession and control of the mower, it is clear that he had sole custody of the mower for enough time to make alterations to the mower.

About two-and-one-half months prior to the filing of this lawsuit in June 2007, Thomas Berry, one of the plaintiff's proffered experts in this case, inspected the mower, which, at that time, was being held in a Lebanon, Tennessee storage facility.  (Docket No. 60 Ex. C.)  In his "Inspection Report," Berry noted that "the left travel control when operated would drive the left rear tire but the right travel control when operated would not drive the right rear wheel/tire."  (*Id.*)  Berry further noted that this finding was consistent with Reese's complaint to Campos about the damage to the mower.  (*Id.*)  Berry also noted that there was "oil residue" on the "right hydrostatic drive unit but not the left."  (*Id.*)  Berry subsequently concluded that "it was noted at the time of

3

my inspection that the right drive motor was not functional due to a stripped or sheared part.  The failure of this drive for the mower may have contributed to causing the rear rollover by causing the mower to jerk or stop and start suddenly on the slope."  (Docket No. 60 Ex. A.)   Berry also examined the accident site and concluded that the accident probably occurred while Campos was operating the mower on approximately a fifteen-degree slope, whereas the defendant, in warnings accompanying the mower, warned against operating the mower on slopes with *greater than* a fifteen-degree angle.

The defendant also conducted a post-accident inspection.  In conjunction with this inspection, in October 2007, fluid samples from both right (non-operational) and left (operational) hydrostatic transmissions were removed from the mower.  (Docket No. 61.)  The defendant commissioned laboratory analysis of the fluids, and that analysis indicates that the fluid removed from the right, non-operational, transmission is consistent with transmission fluid that one might use in an automobile.  Analysis of the fluid removed from the left, operational, transmission found that the fluid is consistent with the factory-installed hydrostatic lubricant.  According to the laboratory report, which, again, was commissioned by the defendant, the automotive transmission fluid in the right transmission was an "improper lubricant," which induced the corrosion of internal components in the mower and the release of metal particles into the transmission resulting in a "metal to metal interference terminating in a catastrophic equipment failure."  (Docket No. 60 Ex. D.)

On June 26, 2007, Campos filed this lawsuit, and, in his operative Complaint, he alleges that MTD was negligent and is strictly liable for selling a defective or unreasonably dangerous

product.  (Docket No. 42.)  At the core of both of these claims is the plaintiff's assertion that the mower should have been designed to include, at least as optional equipment, a "roll bar and seatbelt," or, in other words, a "roll over prevention system (ROPS)."[3]  (*Id.* at 3.)  The plaintiff argues that by failing to include the ROPS as, at least, optional equipment and by failing to warn consumers about the absence of a ROPS, the defendant is liable under both negligence and strict liability theories.  (*Id.* at 3-6.)  The plaintiff seeks actual and punitive damages.  (*Id.* at 6.)

On October 30, 2008, the defendant filed its Motion for Summary Judgment and Motion to Exclude one of the plaintiff's proffered experts, Stuart Statler.  A few days earlier, the plaintiff filed his Motion in Limine to exclude, at trial, any mention or evidence of his alleged alcohol use, specifically, any mention or evidence of his past alcohol and driving-related convictions/legal problems and any mention or evidence of his alcohol use on the day of the accident.  (Docket No. 51.)  On December 10, 2008, after the plaintiff's motion had been fully briefed, the defendant submitted an affidavit from Celia Early, a nurse at Vanderbilt University Medical Center, which was designed to corroborate an argument that the defendant made in response to the plaintiff's motion.  (Docket No. 95.)  The plaintiff has moved to strike that affidavit as improper on various grounds.  (Docket No. 96.)

## ANALYSIS

The plaintiff, Shawn Campos, claims that the defendant, MTD Products, was negligent and is strictly liable for selling the mower, which did not have a ROPS and was sold without warnings

_____

[3] In his Complaint, the plaintiff also asserts that the mower should have had a "slope indicator," or should have been sold with warnings about the risks of not having a slope indicator, although that argument has not been developed in briefing.  (Docket No. 42 at 4-5.)

5

regarding the risks of not having a ROPS. Campos contends that a ROPS would have prevented the tragic physical consequences of his August 19, 2006, accident. MTD argues that, prior to the accident, someone must have contaminated the right transmission with automotive transmission fluid, causing the accident, and, thereby, relieving MTD of liability. In addition to these core arguments, the defendant asserts that, if this case goes to trial, one of the plaintiff's proffered experts, Stuart Statler, should not be allowed to testify, and the plaintiff asserts that, at trial, there should be no mention or evidence of his alcohol use.

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir.

6

2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     MTD's Motion for Summary Judgment

With only a few pages of actual argument, MTD's brief in support of its Motion for Summary Judgment is simple and straightforward. MTD points out that, under the controlling Tennessee Product Liability Act (TPLA), "a manufacturer or seller of a product can be held liable for an injury caused by its product only if the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." (Docket

7

No. 59 at 4 citing T.C.A. § 29-28-105.)  Further, MTD notes that the TPLA provides that, "if a product is not unreasonably dangerous at the time it leaves the control of the manufacturer or seller but was made unreasonably dangerous by subsequent unforeseeable alteration, change, improper maintenance or abnormal use, the manufacturer or seller is not liable."  (*Id.* citing T.C.A. § 29-28-108.)

MTD argues that these points of law, combined with Berry's conclusion that the failure of the right drive of the mower may have contributed to the rear rollover, absolve MTD of  liability. (*Id.* at 6.)  As MTD states in concluding its argument, "plaintiff's engineering witness furnishes the factual linkage between the mower's post-accident condition and the pre-accident substitution of automatic transmission fluid for the proper hydrostatic lubricant."  (*Id.*)  In short, MTD argues that the decision to put automotive transmission fluid into the right transmission was an unforeseeable alteration that caused the accident, and, therefore, under Tennessee law, MTD can have no liability for the accident.  (*Id.*)

There is a disputed issue of material fact as to when the automotive transmission fluid was added to the right transmission, that is, when the product was "altered," which precludes summary judgment for the defendant on the "product alteration" theory.[4]  The defendant, supported by the analysis it commissioned, contends that "the right hydrostatic transmission deteriorated because of the insertion of the automatic transmission fluid and the presence of the metal shavings.  This

---

[4] As the plaintiff correctly argues, logically implicit in the language of T.C.A. § 29-28-108, is a requirement that the relevant product alteration occur *prior* to the incident that caused the harm.  (Docket No. 104 at 10.)  It would make no sense from a legal point of view to absolve a defendant of liability because someone altered an already unreasonably dangerous product after the injury occurred.  (*Id.*)

8

deterioration and the presence of the metal shavings could only occur if the mower was operated after the automatic transmission fluid was inserted." (Docket No. 109 at 3-4.) The defendant points to the sworn statement of Jeff Reece, the individual to whom Campos gave the mower after the accident, which states that Reece was unable to get the mower "cranked." (Docket No. 109 at 4, citing Docket No. 104 Ex. D. at 4.) According to the defendant's commissioned analysis, the metal shavings produced "a metal to metal interference terminating in a catastrophic equipment failure." (*Id.* at 3.) Therefore, the defendant argues, because Reece did not operate the mower, the plaintiff, or someone else, must have added the automotive transmission fluid, that is, altered the product, prior to the accident. (Docket No. 109 at 4.)

On the other hand, the parties agree that Campos "maintained custody and control of [the mower] from the time of purchase until the time of the accident." (Docket No. 110 at 1.) The parties agree that Campos "did not perform maintenance, add any fluid, add any automatic transmission fluid to the transaxle(s)/transmissions, or make any kind of change to [the mower] prior to" the accident. (*Id.* at 2.) Further, the parties agree that Campos "never let anyone else service [the mower]" prior to the accident. (*Id.*) Further, the sworn statement of Mr. Reese states that *he* added automotive transmission fluid to the mower, specifically, Mr. Reese states that "when I got [the] mower home the trans axle was split in half from rollover. I parked in Barn of 237 Salt Lick Creek Rd, Carthage, TN. I tried to put Automatic Transmission Fluid in mower that is primarily used for automobiles. I did this while Mr. Keith Williams was on way to pick up lawnmower. I did nothing else to this lawnmower. I never got mower cranked. I never did any

9

other mechanical work to this mower."[5]  (Docket No. 104 Ex. D. at 4.)  In response, the defendant, relying on its expert analysis, argues that *someone* must have altered the mower prior to the accident in order for the metal shavings to have developed and the corrosion in the right transmission to have occurred, but the defendant posits no theory as to how that alteration occurred in light of the undisputed facts that Campos had custody and control of the mower, did not service the mower and did not permit anyone else to service the mower.  In short, when the automotive transmission fluid was added is a disputed issue of material fact that precludes summary judgment for the defendant on its product alteration theory.

Further, even assuming that the plaintiff added automotive transmission fluid to the right transmission and that caused the accident, the plaintiff could still, credibly, contend that the mower is unreasonably dangerous or defective because of the lack of a ROPS.  (Docket No. 104 at 13.)  The defendant's reply in support of its summary judgment motion has no substantive response to this point.  In a single page of its reply, the defendant (1) rehashes the plaintiff's argument; (2) includes a few lengthy quotations to confirm that the TPLA "applies to all product liability actions"; and (3) argues that the "subsequent intervening act of negligence [addition of the fluid] caused the accident and ... relieves MTD of liability."  (Docket No. 109 at 6.)

_____

[5] In a footnote, the defendant contends that Reece's statement is not "sworn" and, therefore, may not be considered for purposes of resolving a summary judgment motion.  (Docket No. 109 at 2, citing *Dole v. Elliott Travel & Tours*, *Inc*., 942 F.2d 962, 968-69 (6th Cir. 1991)).  Mr. Reese signed a statement prepared by the plaintiff's private investigator, with the provision "I do hereby swear that this statement is true and correct to the best of my recollection of the incident on this date."  (Docket No. 104 Ex. D at 4.)  The defendant has provided no argument that such an affirmation is insufficient to be considered a "sworn statement," as opposed to an "unsworn statement."  Further, the defendant undercuts its argument that Reece's statement is not proper summary judgment evidence by using the statement to advance its position.

10

In short, an analysis of the defendant's reply shows the strength of the plaintiff's argument. Tennessee is a comparative fault state, and, if the jury concludes that the mower was defective or unreasonably dangerous, that same jury could, of course, reduce or eliminate the plaintiff's award by concluding that the plaintiff's fault, whatever its basis, contributed to the accident. *See Artrip v. Norfolk S. Ry. Co.*, 2009 WL 152482, *5 (E.D. Tenn. Jan 22, 2009). The fact that the plaintiff may have been at fault for adding the fluid does not mean that the mower was not defective or unreasonably dangerous due to ROPS issues. Because of the disputed issue of material fact as to when the alteration occurred and because the plaintiff could still assert the mower was defective, even if the "alteration" occurred prior to the accident, the defendant's motion for summary judgment will be denied.[6]

## III.    MTD's Motion to Exclude

The defendant makes a much more convincing case in moving to exclude the testimony of the plaintiff's proffered expert, Stuart Statler. (Docket No. 56.) While the precise contours of Mr. Statler's proposed testimony remain somewhat unclear, the plaintiff does state that "Mr. Statler's expertise will assist the trier of fact in determining not only liability but also whether punitive damages are warranted." (Docket No. 82 at 13.)

Federal Rule of Evidence 702 provides that, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

---

[6] The plaintiff also argues that any pre-accident alteration was foreseeable, at least for purposes of the defendant's summary judgment motion. (Docket No. 104 at 14-15.) As the above discussion shows that MTD is not entitled to summary judgment on its "product alteration" theory, it is not necessary to address this issue.

11

witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In its "gate-keeping" role, a trial court must evaluate the reliability of expert testimony, whether the testimony offered is "scientific" or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

While the court's general "gate-keeping" function exists whenever supposedly "expert" testimony is offered, when that expert testimony is outside of the scientific realm, the court's fundamental objective is to generally evaluate, based on whatever factors are important in the particular case, the relevancy and reliability of the testimony, and not necessarily explore the factors that might be relevant in the realm of "scientific" expert testimony, such as whether the expert's writings have been peer reviewed or whether the expert's methods are subject to empirical testing. *Id*. at 151. That is, the court is to ensure that the proffered testimony is reliable and relevant and that the expert, whatever his field, "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. When expert testimony is primarily based on the experience that the proffered expert has gained through personal endeavors, the expert "must explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (internal quotation omitted). In light of all of this, the court's paramount consideration remains, as explicitly stated in Federal Rule of Evidence

12

702, whether the proffered testimony will assist the trier of fact. Fed. R. Evid. 702.

A review of Mr. Statler's expert report plainly shows that his proffered testimony, while certainly relevant to the issues at hand, is not reliable and would likely confuse and hinder the jury's fact-finding mission, rather than assist it. Mr. Statler states that his relevant "specialized knowledge and expertise" arises "in the areas of consumer product safety generally, manufacturer and seller responsibility, and the consideration of dangerous products by the U.S. Consumer Products Safety Commission (CPSC)." (Docket No. 55 Ex. 3 at 1.) Mr. Statler, a graduate of Harvard Law School, held several high-level positions related to consumer product safety in the late 1960s and early 1970s before President Carter appointed him Commissioner of the CPSC in 1979, a position he held until 1986. (*Id.* at 3-4.) In the introductory section of his report, Mr. Statler repeatedly mentions that he dealt with problems related to personal mower rollover and mower industry inertia on safety issues before and during his time at the CPSC. (*Id.* at 4-7.) Mr. Statler states that the mower industry, particularly MTD, remains resistant to change, particularly when it comes to adding a ROPS to relatively small personal mowers, like the one at issue in this case. (*Id.* at 8.)

After this introductory discussion, the remainder of Mr. Statler's report can be broken down into three sections. One, he discusses some of the factors that "judicial proceedings" and "learned treatises" consider when evaluating whether the risk the product poses is unreasonable under the circumstances. (*Id.* at 9-12.) Two, he engages in a lengthy discussion of "responsible manufacturing and marketing practices," or "system standards," as Mr. Statler terms them. (*Id.* at 12-17.) This discussion provides generalized guidance that, Mr. Statler believes, product

13

manufacturers should follow, such as "product design considerations ... must always be kept foremost in mind when ensuring against unreasonable risks" and "thoroughly identifying product risks, and understanding them fully, is an essential first measure for any responsible product manufacturer." (*Id.* at 13-14.)

Three, Mr. Statler applies his "experience to [the] matter at hand." (*Id.* at 17-27.) In this portion of his report, Mr. Statler first, again, notes that the risk of mower rollover has been well known in the mower industry for decades. (*Id.* at 17.) Then, primarily based on his review of the deposition of MTD's corporate representative (Mr. Plamper) in another mower rollover case, Mr. Statler concludes that MTD has not properly addressed the risk of rollover because it did not install the ROPS on relatively light weight personal mowers such as the one used by the plaintiff. (*Id.* at 19.) This analysis seems rooted mostly in Mr. Statler's review of the deposition and contains numerous, exceptionally broad generalizations such as, "safety was not a priority within MTD" and "adequate records about important safety matters [were not] maintained and kept intact within MTD." (*Id.* at 19-21.) Mr. Statler concludes that MTD made the "conscious decision ... to ignore the overturning hazard and risk consequences of a product known by the company to be capable of causing death and serious injury." (*Id.* at 26.)

Based on this report, the defendant is appropriately concerned that Mr. Statler's testimony is not reliable and will not assist the jury in reaching the appropriate conclusion but will actually hinder their efforts. First, on reliability, Mr. Statler does not appear to be personally knowledgeable about the pros and cons of adding a ROPS to this particular type of mower. Rather, his opinions appear to be largely rooted in his personal and skewed interpretation of (and

14

unsupported extrapolations from) a deposition offered by the defendant's corporate witness in another case. Mr. Statler conducted no analysis of the costs and benefits of installing a ROPS, and instead he chastises MTD because "nothing in Mr. Plamper's deposition suggests that the company ever explored the safety ramifications of incorporating rollover protection for" these types of mowers. (*Id.* at 22.) Therefore, the "method" by which Mr. Statler's opinion was reached appears to the court to be uninformed and unreliable.

Further, Mr. Statler's focus on (and apparent intent to apply) his "system standards" in this case also has the potential to confuse the jury and create, as the defendant puts it, "the illusion of a duty where none exists." (Docket No. 57 at 10.) The issue in this case is whether the mower was defective or unreasonably dangerous because it lacked a ROPS, not because MTD may have failed to employ a series of best practices that Mr. Statler would recommend they should have employed. Mr. Statler's focus on those "system standards" or best practices could confuse the jury about MTD's obligations as a company and as to the plaintiff.

Aside from these potentially confusing "system standards," Mr. Statler offers little in the way of testimony that could not be established more easily and clearly through other means. MTD's awareness of the risk of rollovers is easily established, and the jury can gain an understanding of MTD's response to that risk more clearly by hearing from MTD representatives, rather than hearing Mr. Statler's skewed interpretation of MTD's response.

The plaintiff's response to these concerns is unpersuasive. The plaintiff argues that Mr. Statler will provide the jury with insight as to the prudence of MTD's decision to bring the product to market without the ROPS, considering the state of the scientific and technological

knowledge available in the field. (Docket No. 82 at 14-15.) The plaintiff argues that this testimony will provide the jury with an understanding of "manufacturer conduct and decision-making with respect to safety," which is supposedly a field "in which the jury is likely [not] to have substantial experience," and, therefore, this testimony will provide the jury with an understanding as to whether MTD is liable and whether punitive damages should be imposed. (*Id.* at 14-16.)

All of this, of course, would be much more convincing if there was evidence that Mr. Statler had any unique understanding of the dynamics of the decision to bring the mower to market without the ROPS. Instead, Mr. Statler seems to argue from the obvious, basic points that MTD knew of the risk of rollovers and did not install the ROPS. Mr. Statler's report is devoid of the nuance and insight that would establish a credible, reliable, and helpful opinion. The jury will be much better served by hearing from experts (such as Mr. Berry for the plaintiff) who have specific knowledge of mower technology and the mower industry and by hearing the rigorous examination and cross-examination of individuals involved with MTD. Therefore, the defendant's Motion to Exclude Mr. Statler's testimony will be granted.

IV.     **The Plaintiff's Motion in Limine**

As noted above, the plaintiff has moved, *in limine*, to exclude, during trial, any mention or evidence of the plaintiff's past alcohol use, specifically: (1) the plaintiff's past alcohol and driving-related convictions/legal problems and (2) any alcohol use on the day of the accident. (Docket No. 51.) As the plaintiff readily admits, he has several alcohol and driving-related arrests and convictions, and he has served jail time for both driving under the influence and driving with

16

a suspended license, last serving time in jail, for a suspended license violation, in "2004 or 2005." (Docket No. 52 at 2.)  At his deposition in this case, the plaintiff claims he stopped drinking in 2003, after his last DUI arrest.  (*Id.*)

That said, the defendant claims evidence has emerged that indicates that the plaintiff was drinking on the day of the accident.  First, one of the plaintiff's neighbors, Joshua Lambert, claims that he observed the plaintiff driving the mower before the accident and thought the plaintiff was driving the mower in a "dumb" manner, "up and down" a "pretty steep hill" such that "I was just like, if he keeps going up and down the hill, he's going to wind up flipping that lawn mower." (Docket No. 70 Ex. A.)  Second, after rushing over to assist the plaintiff and immediately after removing the mower from the plaintiff, at the plaintiff's instruction, Lambert called a woman who he supposes was the plaintiff's wife, and, upon telling the woman of the accident, the woman, "really upset [] asked had he been drinking."  (Docket No. 52 at 4.)  Lambert testified that he replied " I have no idea," and the woman said "normally whenever he gets on the lawn mower, he drinks."  (*Id.* at 5.)

Third, the records of the plaintiff's helicopter "LifeFlight" from Carthage Hospital to Vanderbilt University Medical Center state that the plaintiff "became combative" prior to the 7 p.m. flight and needed to be intubated and sedated.  (Docket No. 52 Ex. A.).  Fourth, the LifeFlight records indicate that one of the LifeFlight attendants noted that the plaintiff had the "smell of alcohol on breath."  (*Id.*)  That LifeFlight attendant, Steven Wilkinson, testified at his deposition that he does not remember the specific flight, but that he only makes the "smell of alcohol" notation if the smell is "obvious."  (Docket No. 70 Ex B.)  Finally, a Vanderbilt

University Medical Center record from 1:07 a.m. on August 20, 2006, contains a questionnaire in which the plaintiff (or someone speaking on his behalf) appears to admit to drinking "Today," which would presumably be the day of the accident. (Docket No. 52 Ex. B.)

### A.     Past Convictions/Legal Problems

As noted above, the plaintiff seeks to exclude, at trial, any mention or evidence of the plaintiff's past alcohol use, specifically alcohol and driving related convictions/legal problems. The plaintiff argues, among other things, that this evidence is irrelevant under Fed. R. Evid. 401 and is "inflammatory and unduly prejudicial" and, therefore, should be excluded under Fed. R. Evid. 403. (Docket No. 52 at 6.) The defendant argues that these matters are relevant and not unduly prejudicial because they fairly show that the plaintiff "has a long history of combining alcohol intake with the operation of motor vehicles," and that this evidence is admissible under Fed. R. Evid. 406 as evidence of "habit," that is, "at some point, [the] plaintiff's recklessness behind a wheel must be viewed as a habit." (Docket No. 70 at 5, 12.)

This evidence does not qualify as habit evidence under Rule 406. The plaintiff's record reflects eight criminal convictions, over a twenty-four year period, for offenses such as driving under the influence. This hardly qualifies as evidence that the defendant had a "habit" of operating motor vehicles under the influence of alcohol. *See Mullins v. Fast Motor Serv., Inc.*, 35 F.3d 366, 366 (6th Cir. 1994) (conduct must be "regular" and "automatic" to constitute a habit).[7]

---

[7]The defendant argues, more convincingly, that the statement to Lambert on the phone that "normally whenever [the plaintiff] gets on the lawn mower, he drinks" is evidence of habit. (Docket No. 70 at 11-12.) As discussed below, this statement, while also potentially indicative of habit, is admissible as an "excited utterance."

18

Moreover, the evidence does not come in as prior bad act evidence under Fed. R. Evid. 404(b), as it is not offered for any of the permissible purposes under the rule. And, if one reached the balancing under Rule 403, it would be excluded under that rule as well. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The probative value of this evidence is "substantially outweighed" by the danger of unfair prejudice, confusion of the issues, and waste of time. See Fed. R. Evid 403.

### B.   Alcohol Use on the Day of the Accident

As noted above, there are a handful of pieces of evidence indicating that the plaintiff may have consumed alcohol on the day of the accident. In seeking to exclude mention and evidence of his alcohol use on the day of the accident, the plaintiff takes a two-pronged approach, that is, (1) he argues that the evidence of alcohol consumption, as a matter of law, is not admissible because there is no evidence that the plaintiff was intoxicated, and, (2) under the Federal Rules of Evidence, some individual pieces of evidence of alcohol use should be excluded. (Docket No. 52 at 7-10.) The court will take each point in turn.

First, the plaintiff argues that "the majority opinion in the United States appears to require *exhibition of intoxicated behavior* as a foundational prerequisite to the admissibility of evidence of alcohol use." (*Id.* at 7.) (emphasis in original) In support of this statement, the plaintiff relies on three cases, all of which apply Pennsylvania or New Jersey law, where the issue was whether the results of a blood alcohol test could be admitted at trial without additional evidence of intoxicated

19

behavior or an additional showing of the relevancy of the test. *See Rovegno v. Geppert Bros., Inc.*, 677 F.2d 327 (3rd Cir. 1982); *Beirne v. Security Heating*, 759 F. Supp. 1120 (M.D. Pa. 1991); *Clement v. Consolidated Rail Corp.*, 130 F.R.D. 530 (D. N.J. 1992).

These cases are plainly not relevant, given the context of this case. As Tennessee is a comparative fault state, evidence that the plaintiff used the mower after drinking could be used to show carelessness and thereby attribute fault to the plaintiff, reducing or eliminating his award, should the mower be found to be defective. *See Artrip v. Norfolk S. Ry. Co.*, 2009 WL 152482, *5 (E.D. Tenn. Jan 22, 2009). Therefore, to the extent that the individual pieces of evidence of alcohol use are admissible (discussed below), the defendant is generally free to introduce evidence that the plaintiff was drinking alcohol on the day of the accident.[8]

The issue of whether individual pieces of evidence should be excluded is slightly more complicated. Plainly Lambert's observations of the plaintiff's mower driving are admissible. The statements contained in the "LifeFlight" record regarding the plaintiff's combativeness and alcohol smell, while hearsay, appear to be "records of regularly conducted activity," and, therefore, are admissible under that exception to the hearsay rule, a point that the plaintiff does not

---

[8]The plaintiff also argues that evidence of his alcohol consumption on the day of the accident should be generally inadmissible under Fed. R. Evid. 403, because the evidence would "unduly inflame" the jury. (Docket No. 52 at 8.) Plainly, the Rule 403 calculus is markedly different when considering evidence of past alcohol-related convictions versus evidence of drinking on the day of the accident. The latter evidence is much more relevant, and there is little to the plaintiff's concern that the jury will be unduly inflamed. Drinking alcohol on a Saturday, at one's home, is not an activity that would likely inflame the jury's passions.

20

challenge.[9]  Fed. R. Evid 803(6).  The more challenging evidentiary questions relate to the

statements by the woman to whom Lambert spoke on the telephone and the 1:07 a.m. hospital

record.

The plaintiff moves to exclude, as hearsay, "all testimony by Mr. Lambert concerning

purported statements made by plaintiff's wife/girlfriend during a purported telephone call from

Mr. Lambert following the accident."  (Docket No. 52 at 9.)  The defendant counters that the

statements from the woman are "excited utterances" and, therefore, are admissible under that

exception to the hearsay rule.  (Docket No. 70 at 8.)  An excited utterance is "a statement relating

to a startling event or condition made while the declarant was under the stress of excitement

caused by the event or condition."  Fed. R. Evid. 803(2).  As interpreted by the Sixth Circuit, the

excited utterance exception requires (1) an event startling enough to cause nervous excitement; (2)

the statement must be made before there is time to contrive or misrepresent; and (3) the statement

must be made while the person is still under the stress of the event.  *Haggins v. Warden, Fort*

*Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983).   The key issue is whether the statement

is the product of the shock of the event, thereby reducing the likelihood of fabrication by the

declarant.  *Id.*

Lambert's testimony indicates that the statements of the woman "was he drinking" and

then the subsequent, follow up, statement "normally whenever he gets on the lawn mower, he

drinks" fall squarely within the excited utterance exception.  Lambert's testimony indicates that

---

[9] Hearsay is any statement "other than one made by the declarant while testifying at the
trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid.
801(c).  Absent an exception to the rule, hearsay evidence is not admissible.  Fed. R. Evid. 802.

21

this woman (who was presumably very close to Campos) was startled and upset upon hearing of the accident, and, reflexively and in search of truth, she asked whether Campos was drinking and then explained why she was asked that question. There is every indication that the woman was under the stress of the event at the time she spoke.

In his reply in support of his motion, the plaintiff counters with two Third Circuit cases that hold that the declarant of an "excited utterance" must personally observe the startling event in order for the declarant's statement to be admissible. *Miller v. Keating*, 754 F.2d 507, 511 (3rd Cir. 1985); *U.S. v. Brown*, 254 F.3d 454, 458 (3rd Cir. 2001). In *Brown*, the court made clear that this was a Third Circuit limitation. *Id.* The Sixth Circuit has not required that the declarant observe the startling event in order for his statement to be admissible as an excited utterance. *See Greene v. B.F. Goodrich Avionics Sys.*, 409 F.3d 784, 790-91 (6th Cir. 2005) (pilot's statement that his gyroscope had quit was a permissible excited utterance even though the pilot could not directly see the gyroscope). Further, the woman here "observed" the startling event to the extent possible, that is, for her, the startling event was hearing that the plaintiff had been injured, and, while the under the stress of that event, she made the relevant statements. Therefore, the plaintiff's supposed "personal observation" requirement does not forestall the admission of these statements, and these statements may be admitted at trial as "excited utterances."

Finally, there is the 1:07 a.m. hospital record, in which the plaintiff, or someone speaking on his behalf, states in response to a question that the plaintiff drank alcohol "Today," which presumably refers to the day of the incident. The record itself, while hearsay, appears to be a "record of regularly conducted activity," in which the nurse at Vanderbilt, Ms. Celia Early,

22

entered the responses to the questions on a form.  Therefore, the record itself is admissible under

that exception to the hearsay rule, a point that the plaintiff does not challenge.  Fed. R. Evid

803(6).  The statements in the record, including that the plaintiff drank alcohol on the day of the

accident, were apparently provided by the plaintiff's wife.[10]  These statements, while hearsay,

appear to be admissible as statements "for purposes of medical diagnosis and treatment."  Fed. R.

Evid. 803(4).  Statements made by immediate family members of the patient are included under

this exception to the hearsay rule, under the assumption that a patient and his immediate family

members will be truthful in their statements to hospital staff, in the interest of preserving the

patient's health.  *Danaipour v. McLaray*, 386 F.3d 289, 297 (1st Cir. 2004).  Therefore, this record

and the statements therein are admissible.[11]

---

[10]In its motion in limine response, the defendant argued that the odd timing of the
interview (in the middle of the night, while the plaintiff was sedated) could be explained by the
fact that the plaintiff's wife was the interviewee.  (Docket No. 70 at 5.)  In response, the plaintiff
argued that "nowhere in the medical history is there any indication that Ms. Early actually spoke
with either [the plaintiff or his wife]."  (Docket No. 94 at 5.)  The defendant subsequently
provided an affidavit from Ms. Early, who stated that, based on her review of the 1:07 a.m.
record, which was provided to her by defense counsel, "I am certain that [the plaintiff's] personal
and medical history information was provided to me by his spouse ..."  (Docket No. 95 at 2.)  The
plaintiff moved to strike this affidavit for various reasons, including that Ms. Early's affidavit
was obtained by defense counsel in violation of the plaintiff's rights under the Health Insurance
Information Portability Act (HIPAA).  (Docket No. 97 at 2.)  The Motion to Strike will be denied
as moot.  From the 1:07 a.m. record, which was *publicly filed by the plaintiff* in October 2008, it
is clear that Ms. Early recorded the answers in the regular course of her work, and that the
answers came from the plaintiff or someone with intimate knowledge of the plaintiff's affairs.
That is all that is necessary for the evidence to be admissible over hearsay objections.  Other
objections go to the weight, not the admissibility, of the evidence.

[11]The plaintiff objects, under Rule 403 and generally, to the admission of these individual
pieces of evidence because of reliability concerns related to each.  The plaintiff contends that (1)
his "combativeness" prior to the "LifeFlight" does not indicate he was intoxicated but merely
stressed and angry about the recent accident (Docket No. 94 at 6); (2) the "smell of alcohol on

23

Therefore, for the reasons discussed above, the plaintiff's Motion in Limine will be granted in part and denied in part. That is, mention and evidence of the plaintiff's past alcohol and driving related convictions/legal problems is not admissible, but evidence that the plaintiff consumed alcohol on the day of the accident is generally admissible, and the specific evidence discussed herein related to whether the plaintiff consumed alcohol on the day of the accident is likewise admissible.

## CONCLUSION

For the reasons discussed above, the defendant's Motion for Summary Judgment will be denied; the defendant's Motion to Exclude will be granted, the plaintiff's Motion in Limine will be granted in part and denied in part, and the plaintiff's Motion to Strike will be denied as moot.

An appropriate order will enter.

_____

ALETA A. TRAUGER
United States District Judge

---

breath" statement is merely contained in a "LifeFlight" record made after the attendant's shift, and the actual attendant cannot remember the flight or the plaintiff (*Id.*); (3) Lambert's observations of the plaintiff's driving aside, he saw and noted no other evidence of alcohol use (*Id.* at 7); and (4) while it is logical to assume that the woman who spoke to Lambert on the phone was the plaintiff's wife, there is no way to know that for certain. (*Id.*) These perfectly valid arguments go to the weight, not the admissibility, of the evidence, and the plaintiff is certainly free to raise these points at trial. For Rule 403 purposes, the court does not view the probative value of this evidence as being "substantially outweighed" by any of the Rule 403 factors, and the plaintiff has certainly made no showing to that effect.

24