# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

SHAWN JUAREZ CAMPOS a/k/a          )
ASCENCION JUAREZ CAMPOS            )
                                  )
    Plaintiff,                     )
                                  )    Case No.: 2:07-CV-00029
v.                                )    Judge Trauger
                                  )
MTD PRODUCTS, INC.                )
d/b/a Cub Cadet, a Delaware       )
Corporation,                      )
                                  )
    Defendant.                     )

## MEMORANDUM

Pending before the court are eight motions: (1) the plaintiff's Motion for Sanctions (Docket No. 126), (2) the defendant's Motion to Exclude Testimony of Kathy Ward (Docket No. 132), (3) the defendant's Motion to Strike Untimely Expert Reports and to Exclude Testimony at Trial (Docket No. 135), (4) the plaintiff's Motion for Leave to Submit Late Discovery (Docket No. 137), (5) the plaintiff's Motion for Reconsideration (Docket No. 139), (6) the defendant's Motion In Limine to Exclude Irrelevant Exhibits (Docket No. 142), (7) the plaintiff's Motion for Extension of Time to Complete Discovery (Docket No. 160), and (8) the plaintiff's Motion In Limine [re: ROPS] (Docket No. 174).  The plaintiff has indicated that his Motion for Leave to Submit Late Discovery is subsumed by the plaintiff's Motion for Extension of Time to Complete Discovery.  (Docket No. 161 at 6.)  The plaintiff has also provided additional support for his Motion for Extension of Time to Complete Discovery through a "Supplement" and attached affidavit.  (Docket Nos. 185-186.)

1

For the reasons discussed herein: (1) the plaintiff's Motion for Sanctions will be granted in part and denied in part; (2) the defendant's Motion to Exclude Testimony of Kathy Ward will be granted; (3) the defendant's Motion to Strike Untimely Expert Reports and to Exclude Testimony at Trial will be granted in part and denied in part; (4) the plaintiff's Motion for Extension of Time to Complete Discovery will be granted in part and denied in part; (5) the plaintiff's Motion for Reconsideration will be denied; (6) the defendant's Motion In Limine to Exclude Irrelevant Exhibits will be denied (with reservations) and (7) the plaintiff's Motion In Limine [re: ROPS] will be denied.

## FACTUAL BACKGROUND

This case concerns an August 19, 2006 riding mower accident that rendered the plaintiff a paraplegic.[1]  The plaintiff, Shawn Campos, purchased a new Cub Cadet Z-Force 50 personal riding mower (the "mower") on a payment plan on September 9, 2005.  The mower has a single gasoline engine, which provides the majority of the mower's power; however, the drive to the rear wheels is provided by two separate and independent transmissions ("hydrostatic transmissions").  One transmission powers the left rear wheel, and the other powers the right rear wheel.  The transmissions contain fluids that help drive the mower forward or backward.  The mower is a "zero-turning radius" ("ZTR") design.  The mower did not have a roll bar and seatbelt, or what is also known as a roll over protection system ("ROPS"), and it also did not have a "slope indicator," which is also known as an "inclinometer."  (Docket No. 1 at ¶ 8.)

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 60 and 110) and related affidavits and exhibits, which were provided in conjunction with the defendant's previous Motion for Summary Judgment (Docket No. 58).

2

On August 19, 2006, Campos was riding the mower in his back yard in Carthage, Tennessee. After numerous passes around the yard, Campos was driving the mower up a slope. At this time, the mower "jerked," flipped rearwards 180 degrees, and pinned Campos face-down to the ground, with the mower on his torso and lower body. As noted above, the accident has rendered Campos a paraplegic, unable to move from the waist down.

## PROCEDURAL BACKGROUND

The plaintiff filed this lawsuit on June 26, 2007, alleging that MTD was negligent and is strictly liable for selling a defective or unreasonably dangerous product. (Docket No. 1.) Trial was originally set for April 7, 2009, but, in March 2009, the trial was postponed to April 13, 2010.[2] (*See* Docket Nos. 151 and 154.)

On October 5, 2007, an Initial Case Management Order set numerous deadlines for the case. (Docket No. 23.) In particular, all written discovery was to be completed by April 30, 2008, and all fact discovery was to be completed by June 30, 2008. (*Id*. at 2.) The plaintiff was ordered to disclose his expert witnesses in compliance with Fed. R. Civ. P. 26 and local rules by July 31, 2008, while the defendant was to disclose its expert witnesses by September 1, 2008. (*Id*.) The defendant's expert disclosure deadline was subsequently extended to October 1, 2008 by joint stipulation. (Docket No. 49.)

On February 19, 2009, after substantial discovery and summary judgment briefing was completed, the court denied the defendant's Motion for Summary Judgment on Grounds of Unforeseeable Product Alteration, granted the defendant's Motion to Exclude the Proposed

---

[2] The trial was continued by the court, due to unavoidable conflicts unconnected with this case. (*See* Docket No. 151.) The length of the continuance was due to the schedules of counsel and various expert witnesses.

Opinion Testimony of Stuart Statler, and granted in part and denied in part the plaintiff's Motion

in Limine to Exclude Mention of Alcohol.  (Docket Nos. 128-129.)

<u>**ANALYSIS**</u>

The plaintiff, Shawn Campos, claims that the defendant, MTD Products, was negligent

and is strictly liable for selling the mower, which did not have a ROPS or slope indicator, and

which was sold without allegedly proper warnings.  Campos contends that a ROPS would have

prevented the tragic physical consequences of his August 19, 2006 accident.  In preparation for

trial, both parties have moved to resolve a series of evidentiary and discovery disputes through a

flurry of motions, which the court will consider in turn.

**I.**     **Plaintiff's Motion for Sanctions**

**A.**     **Background**

On August 21, 2008, the parties agreed to extend the deadline to complete depositions in

this case to January 30, 2009, in part, so that the plaintiff could depose defense expert, Dr. Harry

Smith.  (Docket No. 49.)  After some initial discussion, on December 29, 2008, the parties

agreed to conduct Dr. Smith's deposition in San Antonio, Texas on January 22, 2009.  (Docket

No. 138 Ex. C at 1.)  At that time, Ms. O'Byrne (legal assistant for plaintiff's counsel) informed

Mr. Tate (defense counsel) that plaintiff's counsel planned to use "the entire day" to take Dr.

Smith's deposition.  (Docket No. 126 Ex. 2 at 1-2.)  Mr. Tate responded, "Are you kidding me?

An entire day?  Did you folks forget what Dr. Smith charges you, me, and everyone else?"  (*Id.*

at 1.)  Still, Ms. O'Byrne reiterated that "[W]e are asking you and Dr. Smith to block off an

entire [seven-hour] day for his deposition . . . .  Can you both make [that date] work for an ALL

day deposition?"  (*Id.*)  The parties thereafter agreed to a 9:30 a.m. start time, at which point Ms.

4

O'Byrne again emphasized that the deposition would require a full seven hours. (Docket No. 138 Ex. E at 1.)

On January 7, 2009, plaintiff's counsel issued two deposition notices with subpoenas *duces tecum*, one for the videotaped deposition of Dr. Smith, and the other for the deposition of Charles Merrill, the custodian of records for Dr. Smith's firm, Biodynamic Research Corporation. (Docket No. 138 Ex F.) Both notices scheduled the depositions to begin at 9:30 a.m. on January 22, 2009. (*Id*.)

On January 15, 2009, Mr. Tate was ordered by another court to attend a *Daubert* hearing in another matter in Knoxville, Tennessee at 10 a.m. on January 23, 2009. (Docket No. 138 at 3.) Mr. Tate had previously planned to attend a different hearing in Florida on the morning of January 23. (*Id*.) Therefore, on January 15, or shortly thereafter, Mr. Tate changed his January 22 departing flight out of San Antonio so that he could get to Knoxville rather than Florida. (*Id.* at 4.) This required that he change his San Antonio departure time from 6:35 p.m. to 4:31 p.m. (*Id.*.) Mr. Tate did not inform opposing counsel of his new arrangements. (*See id*.)

On January 22, 2009, the depositions of Dr. Smith and Mr. Merrill were conducted, with Mr. Kane attending for the plaintiff and Mr. Tate attending for the defendant. (Docket No. 127.) After deposing Mr. Merrill for approximately forty-five minutes, Mr. Kane began the deposition of Dr. Smith at 10:30 a.m. (Docket No. 138 Ex. I; Docket No. 138 Ex. J.) According to Tate, it was at this time that he realized that his 4:31 p.m. departure from San Antonio was problematic. (Docket No. 138 at 4.) From the deposition, Mr. Tate e-mailed his administrative assistant and instructed her to find a flight that would allow him to leave San Antonio later in the day but still allow him to be in Knoxville for the hearing the next morning, but no such flight existed. (*Id*.)

5

Thereafter, Mr. Tate interrupted Mr. Kane's questioning of Dr. Smith, and he informed Mr. Kane that it might be necessary to end the deposition early based upon his flight schedule for the *Daubert* hearing.  (Docket No. 138 Ex. J at 34:3-35:9.)  Mr. Kane responded courteously, telling Mr. Tate that they should "plan on having [Mr. Tate] out of [the deposition at] about three."  (*Id.* at 35:6-35:9.)  Mr. Tate left the deposition at 3:23 p.m., after Dr. Smith had been deposed for just under four hours.  (Docket No. 126 Ex. 3 at 189-190.)

On January 25, 2009, Mr. Kane sent Mr. Tate a letter regarding the continuation of Dr. Smith's deposition.  (Docket No. 126 Ex. 4 at 1.)  Mr. Kane told Mr. Tate that he believed that "the costs . . . incurred in performing the second deposition should be borne by MTD," and he expressed his frustration at having first learned of Mr. Tate's 4:30 p.m. departure time in the midst of Dr. Smith's deposition, despite the fact that Mr. Tate knew that Mr. Kane intended to use the full seven hours.  (*Id.* at 1-2.)  In response, Mr. Tate balked at Mr. Kane's request, stating that "[m]ultiple good and sufficient reasons prevented the completion of Dr. Smith's deposition," and that the rescheduling was a "relatively minor inconvenience in the midst of a significant and strongly contested lawsuit."  (Docket No. 126 Ex. 5 at 1.)

The parties agreed to reschedule the continuation of Dr. Smith's deposition for February 11, 2009.  (Docket No. 126 at 3.)  As the deposition deadline had been set for January 30, 2009, Ms. O'Byrne contacted Mr. Tate to formally extend the deposition deadline by joint motion.  (*See* Docket No. 138 Ex. L at 1.)  Mr. Tate responded that a formal motion was unnecessary, as all parties understood the reasons for the delay.  (*Id.*)  Regardless, plaintiff's counsel claims that it was "forced" to file a motion for an extension of the discovery deadline.  (Docket No. 126 at

6

*4.)*  On February 11, 2009, the deposition of Dr. Smith was completed in San Antonio, apparently without further incident.

The plaintiff now requests $6,341.83 for the costs incurred to reconvene Dr. Smith's deposition and for additional sanctions for the costs incurred in filing the Motion to Extend and this Motion for Sanctions.  (Docket No. 126 at 11.)

### B.      Analysis

The plaintiff alleges that sanctions under Fed. R. Civ. P. 30(d)(2) are warranted because the suspension of Dr. Smith's deposition forced the plaintiff to "incur fees and expenses not otherwise necessary to complete the deposition," and that this "frustrated the fair examination of Dr. Smith."  (Docket No. 126 at 4, 6.)  Federal Rule of Civil Procedure 30(d)(2) states that: "[t]he court *may* impose an appropriate sanction – including the reasonable expenses and attorney's fees incurred by any party – on a person who impedes, delays, or frustrates the fair examination of the deponent."  Fed. R. Civ. P. 30(d)(2) (emphasis added).

Whether a monetary award is appropriate is an issue within the court's broad discretion, but the court should be focused on whether, considering the totality of the circumstances, a party or its counsel "impeded, delayed, or frustrated" a deposition such that expenses and/or attorneys' fees should be awarded to the other side.  *See C & R Maintenance, Inc. v. City of Warren*, 2008 WL 2783247, *1 (E.D. Mich. July 17, 2008).  Rule 30(d) is also important for purposes of this motion because it establishes that a party is entitled to up to "one day of seven hours" to depose a witness.  Fed. R. Civ. P. 30(d)(1).

Here, plaintiff's counsel repeatedly and explicitly made known to defense counsel that he intended to use his full seven-hour allotment during the day reserved for Dr. Smith's deposition.

7

Indeed, from a review of the documents submitted in conjunction with the motion, it is hard to imagine how plaintiff's counsel could have been more clear that he intended to use all day for the deposition.

While the record does not indicate that Mr. Tate acted intentionally or maliciously in this circumstance, in light of these repeated, clear statements of intent, he was careless and discourteous. Most notably, when his plans changed and he needed to change his flight out of San Antonio, Tate apparently made no allowance for how this change of plans would affect Dr. Smith's deposition, even though the new 4:31 p.m. flight time made it impossible, without considerably moving up the start time of the deposition, to complete Dr. Smith's seven-hour deposition in one day. It remains hard to understand why, in light of the repeated conversations with plaintiff's counsel about the length of the deposition, Mr. Tate did not communicate with plaintiff's counsel about his change of plans until after the deposition was underway. If he had simply spoken up earlier, in all likelihood, a resolution satisfactory to all parties could have been worked out.

Defense counsel's conduct qualifies as "impeding, delaying, or frustrating" the examination of Dr. Smith such that certain expenses and fees should be awarded. Again, while the record does not reveal intentional or malicious conduct by Mr. Tate, such conduct is not required in order to award these fees and costs under Rule 30(d)(2). *See Zamorano v. Wayne State Univ.*, 2008 WL 3929573, *5 (E.D. Mich. Aug. 22, 2008) (citing Rule 30(d)(2) and awarding "reasonable attorneys' fees and costs" associated with the second depositions of witnesses when the first depositions were interrupted by what, after a careful and close consideration of the issue, the court concluded was an improper invocation of the attorney/client

privilege); *FCC v. Mizuho Medy Co, Ltd.*, 2009 WL 1707937, *5 (S.D. Cal June 15, 2009)(applying Rule 30(d)(2) and stating, "because FCC caused the need to continue the deposition, FCC should bear the costs of resuming the deposition.").

Given that the costs associated with the second day of Dr. Smith's deposition could have been avoided had Mr. Tate acted with due care, it is fair to award the plaintiff costs exclusively associated with that second day of deposition. The plaintiff has provided documentation of $6,341.83 in such costs, that is, costs for the travel time of plaintiff's counsel ($250 per hour) and his paralegal ($70 per hour) to and from the second deposition, along with their hotel, airfare, meals, and parking costs associated with the second deposition.[3] The court will award the full travel costs ($1,141.83) but, in light of the standard practice of reduced billing for travel time, the court will award half of the requested travel time expense, that is, $2,600, for a total of $3,741.83.

The plaintiff will also be awarded the reasonable costs of filing the Motion for Sanctions. As noted above, prior to filing this motion, plaintiff's counsel requested that the defendant pay the costs of the second deposition, and defense counsel rebuffed those requests, stating that "[m]ultiple good and sufficient reasons prevented the completion of Dr. Smith's deposition," when, in fact, the record reveals that it was primarily Mr. Tate's carelessness that necessitated the second day of deposition and the resulting costs. Therefore, the costs of this Motion for Sanctions could have been avoided, had Mr. Tate responded appropriately to the plaintiff's request.

---

[3]    In briefing, the plaintiff cites this amount as $6,501.83 (Docket No. 126 Ex. 1 at 10), but the itemized expenses and Mr. Kane's affidavit state that the "total costs and fees" associated with the travel to and from the second deposition were $6,341.83, that is, $5,200 for travel time and $1,141.83 for airfare, hotel, and other associated costs.  (Docket No. 127.)

Plaintiff's counsel has not submitted an affidavit with time records in support of his motion; he states that he will create and submit "a separate affidavit of time and attorneys fees" after the court rules on the motion. (Docket No. 126 Ex. 1 at 10.) In light of the fact that seemingly every dispute in this case results in reams of (often unnecessary) exhibits, affidavits and other materials being filed, the court has every reason to believe that continued filings related to this motion would only result in more gamesmanship and the unnecessary consumption of judicial resources. Given plaintiff's counsel's $250 hourly rate referenced elsewhere and the substantial, but hardly overwhelming, briefing and evidence gathering required by this motion, $3,000 (compensation for twelve hours of attorney time) strikes the court as a reasonable amount. Therefore, the court will award $3,000 in fees to plaintiff's counsel for the filing of the Motion for Sanctions.

The court declines to award any costs to the plaintiff in conjunction with filing the Motion to Extend. As noted above, contrary to the plaintiff's claims here, plaintiff's counsel was not "forced" to file a Motion to Extend, but, rather, he filed this motion despite an agreement between the parties that the continued deposition of Dr. Smith would take place outside of the dates provided by the scheduling order. No conduct by the defendant or its counsel indicates that the plaintiff is entitled to costs associated with the Motion to Extend.[4] Therefore, the court

---

[4] The plaintiff also seeks monetary sanctions pursuant to 28 U.S.C. § 1927, which allows a court to award "the excess costs, expenses, and attorneys' fees reasonably incurred" by a party due to an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. In such a case, the attorney must "personally" satisfy the excess costs. *Id.* Under Section 1927, "an attorney is sanctionable when he intentionally abuses the judicial process or knowingly disregards the risk that his actions will needlessly multiply proceedings." *Royal Oak Entm't, L.L.C. v. City of Royal Oak*, 316 F. App'x 482, 487 (6th Cir. 2009). Therefore, this provision directly punishes an attorney for conduct that exceeds the "unintentional discourtesy" shown here, rather punishing an attorney for conduct that "lack[s] justification and [is] intended to harass." *United States v. Ross*, 535 F.2d 346, 349 (6th Cir. 1976)

10

will grant the plaintiff's Motion for Sanctions in part and award the plaintiff $6,741.83 to be paid by the defendant.

## II.     Defendant's Motion to Exclude Testimony of Kathy Ward

### A.     Background

On September 9, 2008, the plaintiff identified Kathy Ward, former paralegal to plaintiff's counsel, as a proposed witness.  (Docket No. 133 Ex. A at 1.)  The plaintiff proposes to use Ms. Ward to "summarize complex government records regarding injuries to and deaths of persons on riding mowers/garden tractors prepared by the United States Consumer Product Safety Commission ("CPSC")."  (Docket No. 144 at 1.)  The plaintiff explicitly states that Ward is not an expert witness, but a lay witness "summarizing these complex statistics."  (*Id*.)

The plaintiff contends that Ms. Ward has obtained, through extensive data gathering with the help of the CPSC, the CPSC's riding mower/garden tractor rollover accident data from 1980 to 2007.  (*Id*. at 2-3.)  The CPSC's data is broken down into two large categories: (1) incidents directly reported to the CPSC, and (2) a CPSC statistical analysis that "estimate[s] the numbers of such injuries/deaths throughout the United States represented by the reported incidents."  (*Id*.)  This statistical analysis was performed by individuals at the CPSC, not by Ms. Ward.  (*Id.* at 3.)  The plaintiff states that, "based on this evidence directly from the CPSC, Ms. Ward prepared a summary of those findings, totaling the number of injuries and deaths represented by the [statistical analysis/national estimate] data." (*Id.)*  Ward also prepared a similar summary of the incidents directly reported to the CPSC from 1980 to 2007.  (*Id*.)  The plaintiff contends that the

_____

(internal citations and quotation omitted).  In light of the discussion above, additional sanctions under this provision are inappropriate.

CPSC has "certified these data records" on which Ward relied, and Ward should be permitted to offer testimony on the summaries.  (*Id.*)

**B.      Analysis**

The plaintiff contends that, under Fed. R. Evid. 611(a), it is entirely appropriate for Ward to offer this testimony, so long as a limiting instruction is presented that states that the summary is not evidence and is only presented for the limited purpose of summarizing voluminous data. (Docket No. 144 at 4, citing Fed R. Evid. 611; *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991)).

When a trial court permits a witness to offer a summary pursuant to Rule 611(a), the summary itself may not be admitted into evidence; rather, the summary is a device used to aid the jury's understanding of "evidence, such as documents, recordings, or trial testimony, *that has been admitted in evidence*."  *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998) (emphasis added); *see also Paulino*, 935 F.2d at 753 (stating that summaries presented pursuant to Rule 611(a) summarize "documents already admitted in evidence").  Therefore, the underlying materials that Ms. Ward is summarizing must be admissible.

The defendant argues that Ms. Ward's Data Summary is inadmissible, because the underlying CPSC data is hearsay.[5]  (Docket No. 131 at 3.)  In response, the plaintiff contends that the underlying data is not hearsay under the public and business record exceptions to the

_____

[5]The defendant also contends that Ms. Ward's proposed testimony is hearsay because Ms. Ward's accident reports rely "on knowledge and information obtained from personnel at the CPSC – none of whom can be compelled to testify at trial."  (Docket No. 131 at 2.)  This argument is not persuasive, because it is clear that these conversations with CPSC officials only provided Ms. Ward with a "roadmap" as to how to obtain the data, and the plaintiff further explains that Ms. Ward will not testify as to her conversations with those CPSC employees. (Docket No. 144 at 2.)

12

hearsay rule. (Docket No. 144 at 5-6, citing Fed. R. Evid. 803(6); Fed. R. Evid 803(8)). The plaintiff has not provided all of the "underlying data compilations provided by the CPSC" because they are "extremely voluminous" and it would be a "burden[]" on the court to receive them. (Docket No. 144 at 3; Docket No. 147.)

The issue of the admissibility of CPSC reports is well summarized in *Knotts v. Black & Decker, Inc*., 204 F. Supp.2d 1029, 1041 (W.D. Ohio 2002). There, the court recognized that the admissibility of CPSC reports depends, perhaps unsurprisingly, on the nature of the report. *Id.* If the CPSC report is a laboratory test report, a research paper, or an analysis of whether a particular product meets CPSC regulations, then the report is likely admissible either under Rule 803(6) or 803(8). *Id; see also Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 511 (6th Cir. 1998); *United States v. Midwest Fireworks Mfg. Co.*, 248 F.3d 563, 566 (6th Cir. 2001). That said, when the CPSC documents are "factual reports" of specific incidents, as is the case here, the "documents are not merely statistics but contain witness or eyewitness statements by someone not an employee of the CPSC as to an incident," creating a "double hearsay" problem, where the material within the CPSC document is inadmissible because it relies on out-of-court witness statements. *Knotts*, 204 F. Supp.2d at 1041.

It is not necessary for the plaintiff to provide all of the underlying data for it to be clear to the court that the CPSC reports at issue here rely upon information that is hearsay, that is, out-of-court statements of witnesses and other people associated with various riding mower accidents provided for the truth of the matter asserted. (*See, e.g.*, Docket No. 144 Ex. D.) The CPSC statistical reports that have been provided to the court demonstrate that the CPSC accident data here is generated by fact-specific witness statements that describe the manner, type, and location

13

of injury. (*Id.*) This testimony is clearly hearsay. As Ms. Ward's summary relies on evidence that is, in large part, not admissible, her summary is not admissible under Rule 611, and, therefore, the defendant's motion to exclude her testimony will be granted.

### III. Motion to Strike Untimely Expert Reports and to Exclude Testimony at Trial

The defendant has moved to strike the allegedly untimely expert reports of Thomas Berry, Edward Karnes, and George Nichols and to exclude Karnes and Nichols from testifying at trial altogether, on the grounds that they were disclosed in an untimely manner. (Docket No. 135.)

#### A. Background

As noted above, the deadline for the plaintiff's disclosure of expert witnesses was July 31, 2008. (Docket No. 23 at 2.) On that date, the plaintiff disclosed the names of seven expert witnesses, including Thomas Berry, Dr. David Lenorovitz, and Dr. Edward Karnes. (Docket No. 135 Ex. A.) While the plaintiff produced an expert report for most of his experts, no such report was provided for Dr. Karnes. (*See id*. at 2-3.) Rather, the plaintiff advised that Dr. Karnes was to "testify to matters as set forth in the report of Dr. David R. Lenorovitz."[6] (*Id*. at 3.)

After the defendant timely disclosed its five expert witnesses on October 1, 2008, the plaintiff produced the three expert reports at issue here. First, on November 10, 2008, Mr. Berry produced a two-page report, which offered six additional opinions based upon his review of the defendant's experts' reports. (Docket No. 135 Ex. C at 1.) Second, on December 6, 2008, Dr. Karnes produced what he termed a "supplemental/rebuttal report," containing opinions not

---

[6] Although the plaintiff provides no explanation for this, Dr. Lenorovitz apparently will not be testifying at trial. (*See* Docket No. 167 at 5.)

addressed in the July 31, 2008 Dr. Lenorovitz report. (Docket No. 135 Ex. F at 1.) This report

was based upon his "review" of the defense expert reports, testimony of the defense experts in

other cases, and upon his visit to the site of the accident, along with his "forty-six years of

professional experience as a human factors psychologist." (*Id*.) Finally, on January 7, 2009, the

plaintiff disclosed the December 22, 2008 expert report of Dr. George R. Nichols, which

provided a causation analysis of the plaintiff's injuries based on voluminous medical records,

deposition testimony, filings in this case, and other assorted materials. (Docket No. 135 Ex. H.)

Dr. Nichols concluded that the cause of the plaintiff's injuries was the rear rollover of the mower

and that there was no evidence that the plaintiff was impaired by alcohol at the time of the

accident. (*Id*. at 3.) Dr. Nichols was not disclosed in the plaintiff's July 31, 2008 disclosure.

(*See* Docket No. 135 Ex. A.)

In light of these allegedly untimely submissions, the defendant requests that the court

strike Mr. Berry's November 10, 2008 Report and exclude Dr. Karnes and Dr. Nichols

altogether. (Docket No. 136 at 14.)

### B.    Analysis

A party must disclose its experts "at the times and in the sequence that the court orders."

Fed. R. Civ. P. 26(a)(2)(C). This disclosure must be "accompanied by a written report –

prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). This written report must

contain, among other things, "a complete statement of all opinions the witness will express and

the basis and reasons for them" and "the data or other information considered by the witness in

forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).

In addition to the initial expert disclosure and report discussed above, circumstances may

15

arise in which a party provides either a supplemental or rebuttal report. Indeed, a party has a duty to timely supplement expert disclosures to correct incomplete or incorrect information; that said, a party may not use the guise of "supplementation" to "ignore court deadlines, reopen discovery, find new facts, and generate new expert reports." *See* Fed. R. Civ. P. 26(e)(1)-(2); *Potluri v. Yalamanchili*, 2008 WL 5060574, at *2 (E.D. Mich. Nov. 24, 2008). Supplemental reports must be provided in a "timely manner," or as provided by the court. Fed. R. Civ. P. 26(e)(1). Under Local Rule 39.01(c)(6)(d), supplemental expert reports submitted "after the applicable disclosure deadline" may only be provided with leave of court

As to rebuttal reports, the Federal Rules of Civil Procedure allow for an expert to provide a report that "rebuts" a report submitted by the expert on the other side. This rebuttal report must be intended "solely" to contradict or rebut "evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)." Fed. R. Civ. P. 26(a)(2)(C)(ii). This rebuttal report must be disclosed "within 30 days after the other party's disclosure." *Id.* Despite this provision, the Local Rules of this court state: "There shall be no rebuttal expert witnesses, absent timely disclosure in accordance with these Rules and leave of Court." L.R. 39.01(c)(6)(d). Although rebuttal experts are sometimes discussed at the initial case management conference and provided for in the initial case management order, they were never raised by either party in this case.

Federal Rule of Civil Procedure 37(c)(1) "puts teeth" into the Rule 26 provisions discussed above, because it requires that a court "impose a sanction for violation of the disclosure requirement," unless the violation was "substantially justified or is harmless." *See* Fed. R. Civ. P. 37(c)(1); *Vaughn v. City of Lebanon*, 18 F. App'x 252, 263 (6th Cir. 2001); *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003). A violation is

16

"harmless" when it is based upon "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003). The district court has broad discretion to impose the appropriate sanction, and the sanction of exclusion is certainly appropriate when the failure to abide by the requirements of Rule 26 is not substantially justified or harmless. *See Roberts*, 325 F.3d at 782. With these points in mind, the court turns to the three expert reports at issue here, before considering the appropriate sanction.

### 1. Thomas Berry

Mr. Berry's November 10 report is not a timely initial disclosure, nor can it be fairly considered a supplemental report under Rule 26(e), because it does not seek to correct incomplete or incorrect information; rather, the report attempts to respond to the reports submitted by the defendant's experts by discussing topics raised in their reports and not discussed in Berry's timely July 31 report.[7] (Docket No. 135 Ex. B; Docket No. 135 Ex. C.) Mr. Berry's November 10 report specifically states that it is based solely upon Mr. Berry's "review" of the defendant's experts' reports, and it squarely addresses issues brought up in the defendant's experts' reports. Therefore, Berry's November 10 report should be classified as a "rebuttal"

---

[7] In large part, the July 31 report discussed: (1) the hazard that a mower like the one at issue would roll over; (2) that MTD's Cub Cadet Z-Force 50 was "unreasonably dangerous" and defective due to the lack of a ROPS, inadequate warnings about how to mow on slopes, and the lack of an inclinometer; (3) that alternative designs were available; and (4) that a ROPS and inclinometer would have prevented the plaintiff from being injured. (Docket No. 135 Ex. B at 14-15.) The November 10 report, however, discusses more discrete topics, such as the accuracy and relevancy of a technical paper relied upon by the defendant's experts, the comparability of ATVs to the mower at issue, operational safety in forklift rollovers, the amount of horsepower required for a rear rollover, and the inadequacy of MTD's slope-determining chart. (Docket No. 135 Ex. C. at 1-2.) While not always explicitly stated, these opinions are clearly offered in direct rebuttal to the opinions stated in the defense experts' reports.

17

report.  As a rebuttal report, Berry's November 10 submission is technically untimely, as it was submitted on November 10, some forty days after the defendant's experts' disclosures, instead of the thirty days allowed by Rule 26.  Additionally, while the plaintiff uses his response to the defendant's motion to ask for leave, the plaintiff did not seek leave of court prior to submitting Dr. Berry's report.  (Docket No. 167 at 7.)

### 2.    Dr.  Karnes

While the plaintiff contends that Dr. Karnes was timely disclosed as an expert in this case, the record shows otherwise.  On July 31, 2008, the plaintiff produced a report from Dr. Lenorovitz, which Dr. Karnes co-signed.  (Docket No. 135 Ex. A at 2-3.)  However, at his deposition, Dr. Karnes testified that he did not review the materials that Dr. Lenorovitz relied upon, that he did not review Dr. Lenorovitz's report until the final draft had already been completed, that he had to "defer" to Dr. Lenorovitz's engineering opinions as stated in the report, and, generally, he was not particularly involved in the drafting of the report.. (Docket No. 135 Ex. G at 68-70.)  In fact, Dr. Karnes could point to nothing in the July 31, 2008 that was "uniquely [his] that [he] contributed."  (*Id.* at 68.)  Therefore, in spite of his co-signing the Lenorovitz report, it is clear that, as of July 31, 2008, Dr. Karnes had not produced the required written expert report that would include, among other things, a complete statement of *his* opinions and the basis for those opinions.

Dr. Karnes did produce a report on December 6, 2008.  While Dr. Karnes attempts to couch this report as a "supplemental/rebuttal" report, the report does not appear to be rebutting defense expert reports; rather, Dr. Karnes challenges Gunther Plamper's (MTD expert) "testimony" (presumably in the earlier *Hayes v. MTD* case) and MTD's theories regarding the

18

safety of the mower at issue here, with his own testing and experience. (Docket No. 135 Ex. F at 1.) That is, this report is simply Dr. Karnes's expert report based (1) on his experience and qualifications as a "human factors expert," (2) his review of the record in this case, (3) his review of previous testimony offered by MTD officials, and (4) his own testing of the slope at the incident site. (*See id*.) Further, even to the extent that certain aspects of this expert report could somehow be considered a rebuttal report, the plaintiff did not disclose this report until more than two months after the defendant disclosed its expert witnesses, and the report would, therefore, be untimely.

### 3.    Dr. Nichols

Dr. Nichols was simply not disclosed in the plaintiff's July 31, 2008 disclosure statement. (*See* Docket No. 135 Ex. A.) Rather, he was first disclosed to the defendant on January 7, 2009, supposedly as a "rebuttal expert to Defendant's own medical expert Dr. Smith." (Docket No. 167 at 4, 10.) Again, while the plaintiff couches this report as a "rebuttal," the report is simply an initial expert report that relies on the expert's experience, qualifications, and review of the record in the case to form a series of opinions. That is, the expert report of Dr. Nichols does not appear to be specifically rebutting information in a defense expert report in this case, but is rather responding to the general defense allegation that alcohol played a role in this incident. (*See* Docket No. 135 Ex. H.) Also, again, even to the extent that this expert report could be considered to be rebuttal, the plaintiff did not disclose Dr. Nichols until more than three months after the defendant disclosed its expert witnesses, and the report would, therefore, be untimely.

### 4.    Sanctions

The plaintiff argues that, "to the extent that [the disclosures] were untimely," the failure

19

was "harmless."[8]  (Docket No. 167 at 9-10.)  That is, the failures "were the result of an honest mistake in failing to clarify the scheduling order with respect to supplemental/rebuttal reports and/or to request leave of court for such disclosures prior to making them.  Moreover, Defendant had sufficient knowledge of these witnesses."  (*Id*. at 10.)  The plaintiff's argument is not credible.  First, as discussed above, as to Karnes and Nichols, these reports cannot be reasonably considered "supplemental/rebuttal reports" but, rather, they are simply expert disclosures made in a markedly untimely fashion.  Further, the disclosure requirements as to supplemental/rebuttal reports are clear from the rules.

Also, other than the plaintiff's assertion, there is no indication that the defendant should have expected at least two of the reports at issue.  Dr. Nichols was not mentioned in the plaintiff's July 31, 2008 disclosure, and, indeed, he had actually served as an expert for the defense in a previous litigation involving the same counsel as in this case.  (*See* Docket No. 136 at 6.)  As to Dr. Karnes, the defendant had no reason to expect that he would release a report months after the disclosure deadline, particularly as he had been previously associated (somewhat disingenuously) with another expert report.

 The plaintiff also argues that there is no prejudice to the defendant from the late disclosures.  (Docket No. 167 at 8.)  That is, because the trial is still months away, the defendant can simply depose the experts as to these disclosures.  (*Id*.)  However, Fed. R. Civ. P. 37(c)(1) does not require that the defendant show prejudice; rather, the rule requires that the plaintiff show harmlessness or justification.  *Sommer*, 317 F.3d at 692.  Plainly, the plaintiff's explanation for why its conduct in this case was harmless is not credible, and, moreover, it

---

[8]The plaintiff does not independently argue that his failure to comply with Fed. R. Civ. P. 26(a) and the court's scheduling order is "substantially justified."  (*See* Docket No. 167.)

20

would clearly be  harmful for the defendant to rely on the plaintiff's expert disclosures for many months and then have to respond to completely new reports disclosed many months after the deadline.

As the delays here cannot be excused, a sanction must be imposed under Fed. R. Civ. P. 37(c)(1).  As noted above, exclusion of the expert is appropriate for disclosure violations.  Here, it is plainly appropriate to exclude Dr. Nichols and Dr. Karnes from testifying at trial.  Their reports were disclosed months after the discovery deadline, with no real excuse.  A lesser sanction would encourage similar behavior.  As to Mr. Berry, while his brief rebuttal report was disclosed ten days late, not allowing him to testify on those points from the rebuttal report strikes the court as overly harsh.  *See* Fed. R. Civ. P. 37(c)(1)(A)-(C).  Therefore, to the extent the defendant seeks to depose Mr. Berry on his November 10 report, the court orders that the plaintiff pay the defendant for its "reasonable expenses" incurred thereby.  *See* Fed. R. Civ. P. 37(c)(1)(A).

## IV.      Motion for Extension of Time to Complete Discovery

The plaintiff has also filed a motion to extend the "general discovery in this case." (Docket No. 161 at 1.)  This motion subsumed the plaintiff's previous Motion for Leave to Submit Late Discovery.  (Docket No. 161 at 6; Docket No. 137.)  As this case was only weeks from trial when the trial was continued, the major discovery deadlines had well passed at the time the plaintiff filed these motions to extend the discovery deadlines.  Under Fed. R. Civ. P. 16(b)(4), a court may amend the scheduling order when "good cause" is shown.  Fed. R. Civ. P. 16(b)(4).  When evaluating whether to amend the scheduling order, the court should consider the totality of the circumstances, along with the requesting party's diligence in meeting the

21

requirements of the original order and any resulting prejudice to the side opposing the amendment of the order. *See Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005).

The plaintiff argues that discovery should proceed during this period before trial because: (1) the plaintiff's health condition is worsening and, therefore, supplementation of such reports as his life care plan and his rehabilitation evaluation will be necessary; (2) the defendant has allegedly improperly destroyed records of previous lawsuits and, therefore, the plaintiff needs discovery to continue its search for the records of these cases; (3) further rollover accidents are undoubtedly occurring and the plaintiff should be entitled to take discovery so that the plaintiff does not have to rely on the defendant to supplement rollover information related to recent accidents; (4) discovery would be necessary to capture any policy change regarding ROPS by the defendant or other manufacturer during this intervening period before trial; (5) an updated *Consumer Reports* review of riding mowers may come out between now and the trial which, based on its discussion of ROPS, might indicate whether not having a ROPS was unreasonably dangerous; (6) new information and regulations might become available from the CPSC; and (7) in light of a factual dispute that emerged during summary judgment briefing, additional testing is necessary on the right rear wheel of the mower and the "transaxle wheel assembly." (Docket No. 161 at 2-6.)

Most of these grounds provide no basis for reopening discovery. First, as to the plaintiff's health condition, Fed. R. Civ. P 26(e) requires that both parties provide supplemental discovery to the extent "additional or corrective information" related to a previous discovery request becomes available. Fed. R. Civ. P. 26(e). This duty to supplement means that new

22

information regarding the plaintiff's health condition would be disclosed, regardless of whether discovery was generally reopened, and, therefore, this ground provides no justification for reopening discovery.

The plaintiff's second basis is somewhat confusing. In briefing, the plaintiff alleges that the defendant has destroyed records of previous lawsuits but that the plaintiff is pursuing its own ongoing, independent investigation, that is, "diligently searching court records to ascertain the existence of other rollover cases." (Docket No. 161 at 2.) While the plaintiff is certainly entitled to carry on its own investigation, the plaintiff has not shown why its independent investigation is a basis for reopening discovery. To the extent that the plaintiff seeks to depose MTD officials about additional lawsuits it may uncover, there is not "good cause" for re-opening discovery because the plaintiff could have located these past lawsuits during the fact discovery period, and, moreover, it seems unlikely that the defendant would have any particularly useful information, given that officials from MTD have repeatedly testified that they do not retain records of these past lawsuits after a certain period, pursuant to an established document retention policy. (*See id.*) Simply put, this is not a basis for reopening discovery, although nothing prevents the plaintiff from using this time to continue an investigation.

Third, as to additional rollover accidents, as noted above, both parties have a duty to supplement under Rule 26(e) during this intervening period. The plaintiff admits in briefing that the defendant has provided routine supplements to its discovery responses regarding rollovers during this intervening period. (Docket No. 161 at 3.) Despite challenging the admissibility of this material, MTD pledges to continue supplementation during the intervening period. (Docket No. 171 at 9.) Therefore, this ground does not provide a basis for reopening discovery.

23

The fourth basis, to capture policy changes regarding ROPS within MTD and the mower industry at large, is similarly unavailing. The defendant uses its response to argue that any such evidence regarding other manufacturers would be irrelevant. (Docket No. 171 at 11.) Certainly, the relevance/admissibility of any policy change as to ROPS by another manufacturer in this industry would be dubious, and, while the plaintiff is certainly entitled to conduct its own independent investigation of the industry using research tools, this matter hardly provides a basis for reopening discovery. *See Brown v. Raymond Corp.*, 318 F. Supp. 2d 591, 599 (W.D. Tenn. 2004) ("The existence of a better, safer or different design that would have averted the injury is not dispositive under Tennessee law. . . . The relevant question is always whether the actual product designed and produced is unreasonably dangerous."). The defendant does not dispute that any intervening change in MTD's policy, whatever its admissibility at trial, could well require supplementation under Fed. R. Civ. P. 26(e). Therefore, this fourth ground does not provide a basis for reopening discovery.

The fifth and sixth grounds are similarly unavailing. Both requests are based on the entirely speculative notion that new information on ROPS will come out either through additional CPSC material or through additional *Consumer Reports* material, which hardly seems a valid basis for reopening discovery. It is not clear why the court should reopen discovery in anticipation of material that, if it became available, would likely be readily available to both sides. These grounds, therefore, do not provide bases for reopening discovery.

The closest call relates to the plaintiff's request to re-open discovery, on a limited basis, to conduct testing on the right wheel and the "transaxle wheel assembly." By way of review, the dispute here relates to automotive transmission fluid that may have been added to the transaxle

24

wheel assembly of the mower. (Docket No. 161 at 5.) From Mr. Berry's first examination of the mower after the accident, it has been clear that there is some sort of "oil residue" on the right side of the mower. (Docket No. 60 Ex. C at 2.) The plaintiff contends that, after the accident, he learned that Jeff Reece, the individual who had purchased the mower from the plaintiff, had added transmission fluid in an opening on the right side of the mower in an attempt to fix the non-operational right wheel of the mower. (Docket No. 161 at 5.) On October 1, 2008, in conjunction with its expert disclosures, the defendant disclosed an expert, Norman Rice, who intends to testify that improperly added transmission fluid caused the right wheel to fail and the accident to occur. (*Id.*) The plaintiff did not believe it was worthwhile to conduct "expensive and possibly destructive testing to take the wheel assembly apart" to rebut Rice's theory, because the plaintiff felt he understood the reason for the presence of the fluid that Rice was discussing, that is, that Reece added it post-accident. (*Id.*)

In its summary judgment reply, in light of Reece's sworn statement that he added the transmission fluid to the mower, the defendant offered the theory that the plaintiff must have added similar fluid as well, prior to the accident. (*Id.* at 6.) The plaintiff contends that he could not have anticipated this "two installations of transmission fluid into the transaxle assembly" theory, and, when the theory was advanced for the first time in the reply, only three months remained before trial and there was simply not the time to conduct the additional discovery into this issue with all of the other pre-trial obligations. (*Id.* at 5-6.) However, with the additional time afforded by the continuance, the plaintiff requests that he now be permitted to propound limited discovery related to other, similar "transaxle wheel assembly failures" and also that he be permitted to conduct "potentially destructive testing on the transaxle wheel assembly by a

25

metallurgist and/or chemical engineer on plaintiff's behalf with appropriate representatives of the defendant allowed to be present." (*Id.*)

As an initial matter, as the defendant points out, as of Berry's April 2007 examination of the mower, the plaintiff knew that there was a problem with the right drive motor, in that "the left travel control when operated would drive the left tire, but the right travel control when operated would not drive the right wheel/tire." (*See* Docket No. 60 Ex. C at 2.) Therefore, the plaintiff had plenty of time to learn about this issue and to propound general discovery into "wheel assembly failures," and, at this late date, it would be unfair to the defendant to reopen general discovery into that area.

The closer question relates to whether potentially destructive testing of the mower is appropriate. In initial briefing, the plaintiff was somewhat unclear as to what this potentially destructive testing would involve or why it was necessary. However, in a recently filed "supplemental" affidavit, Berry states that, in order to determine the cause of the right drive failure, it is valuable to know which parts within the drive may have failed, and in order "to determine the parts that failed within the integrated hydrostatic drive it would be very helpful for the drive to be disassembled and inspected to check for failed or worn parts, sticking of the bypass assembly and evidence of excessive loading." (Docket No. 186 at 2.) Further, "the teardown inspection of the integrated hydrostatic drive motor would require its removal from the lawn tractor and could be destructive of evidence in that it can only be performed once and once removed would alter the attachment of the control linkages, bypass assembly and the position of the parts inside the drive motor. Therefore, all parties should be present to witness the condition and disassembly of the drive." (*Id.*)

26

The issue of whether the accident was caused by the addition of fluid by the plaintiff does seem to have emerged after fact discovery concluded, and summary judgment briefing does appear to be the first point that it was fully clear to both sides that the defendant was alleging that the accident was caused by the plaintiff's improper addition of fluid. (Docket No. 181 at 5.) Given that this testing promises to shed light on the cause of the accident and given that there is now time to conduct this testing, there is "good cause" to amend the scheduling order to permit this limited, potentially destructive testing of the mower. *See* Fed. R. Civ. P. 16(b)(4). Therefore, the court will grant the plaintiff's motion to extend the time to complete discovery for the limited purpose of conducting the potentially destructive testing described above. The issues surrounding the parameters and mechanics of that testing will be referred to Magistrate Judge Griffin.

## V.      Motion to Reconsider

In its February 19, 2009 Order, the court granted the defendant's motion to exclude the proffered expert testimony of Stuart Statler, whom the plaintiff had offered as an expert based on his many years of experience working in high level government positions (including in the CPSC) in areas dealing with consumer product safety. (*See* Docket No. 128 at 13.) In short, Mr. Statler intended to offer a generalized discussion of "system standards" properly used by a responsible manufacturer of consumer products, and he intended to apply those system standards to the matter at hand. (*Id.*) The court ruled that Mr. Statler's proffered testimony was not reliable under *Daubert*. (*See* Docket No. 129.) The plaintiff asks the court to reconsider that decision and allow Mr. Statler to testify as a lay witness, arguing that he will testify with "personal knowledge of relevant actions taken by the CPSC with regard to rider lawn mowers."

27

(Docket No. 140 at 3-9.)

In this Circuit, Federal Rule of Civil Procedure 54(b), in addition to the common law, provides the basis for the court to reconsider an interlocutory order. *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). Courts are justified in reconsidering interlocutory orders when there is: (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice. *Id*. "A motion to reconsider under Rule 54(b) . . . may not 'serve as a vehicle to identify facts or raise legal arguments which could have been, but were not, raised or adduced during the pendency of the motion of which reconsideration was sought.'" *Owensboro Grain Co. v. AUI Contracting, LLC*, 2009 WL 650456, at *2 (W.D. Ky. Mar. 10, 2009) (internal quotation omitted).

Here, the plaintiff's motion is misplaced. The defendant's motion asked the court to rule that Mr. Statler was not qualified as an expert under *Daubert*. (*See* Docket No. 56.) The plaintiff never raised any sort of "lay witness" argument, and, after reviewing the briefing and the record, the court granted that motion. (*See* Docket Nos. 82, 129.) Now, under the guise of a motion to reconsider and armed with a redacted expert report, the plaintiff asks the court to "rubber stamp" any attempt it might make to offer Mr. Statler as a lay witness at trial, testifying about more limited areas, supposedly within his personal knowledge. (Docket No. 140.) Whatever relevant lay testimony (presumably based on his personal observation of matters at the CPSC) Mr. Statler might be competent to offer has nothing to do with whether the court should reconsider its decision on Mr. Statler's qualifications as an expert. The court, on a motion to reconsider a *Daubert* motion, will not preordain the validity of Mr. Statler's potential lay

28

testimony one way or the other.  The plaintiff's motion will be denied.

VI.     **Motion to Exclude Irrelevant, Inadmissible, or Unfairly Prejudicial Exhibits**

The defendant has moved, *in limine*, to exclude allegedly irrelevant, inadmissible, or unfairly prejudicial exhibits.  (Docket No. 142.)  The defendant has provided the court with a CD-ROM containing more than 1,000 exhibits that the plaintiff has provided to the defendant in a series of disclosures and that, the defendant claims, the plaintiff may intend to use at trial. (Docket No. 152; Docket No. 143 Exs. 1-10.).  The defendant seeks to exclude all of these exhibits at trial.  (Docket No. 143 at 1.)  To avoid discussing each document at issue, the defendant has attempted to organize the documents into ten categories, and the defendant has provided the court with ten charts that give a brief description of the documents in each of the ten categories.  (*See* Docket No. 143 Exs. 1-10.)

As a technical matter, the court will deny the motion.  That is, months before trial, with no indication as to which documents the plaintiff will actually use at trial or for what purpose, it is not in the interest of judicial economy to analyze the potential admissibility of each exhibit. At this stage, all the court can do is offer its general impressions, which, the court trusts, both sides will use as a guide going forward.

A.      **Category One: Any Writing Published Before 1985**

The first category consists of forty-nine periodical articles published before 1985.  (*See* Docket No. 152 Chart 1.)  The defendant contends that these articles are irrelevant as they are "outdated" and "misleading," although the defendant provides no explanation for the 1985 cut-off date.  (Docket No. 143 at 5-6.)  The plaintiff asserts that the articles "deal with exactly the

29

same problem . . . and the same solution (ROPS) which Plaintiff contends Defendant should have used here . . . [in addition to] the need for safety to be incorporated into the design of machinery at the time manufactured."[9]  (Docket No. 164 at 8.)

The majority of this material appears inadmissible as irrelevant or of such minute probative value that it would be inadmissible under Rule 403.[10]  Indeed, many of the exhibits in Chart One discuss equipment that is quite dissimilar to the equipment at issue; that is, nearly all of the exhibits describe agricultural and industrial equipment manufactured decades (some nearly a century) ago.  *See Wolfgram v. Bombardier Limited*, 1982 U.S. App. LEXIS 11753, at *9 (6th Cir. 1982) (holding that material "antecedent to the manufacture" of the product at issue and that was applicable only to "industrial machinery rather than consumer products" was not relevant).

Moreover, while some of the exhibits purport to show prior incidents of rollovers, the plaintiff should recall that evidence of a prior accident is not relevant in a products liability action unless it is "substantially similar" to the incident at issue.  *Croskey v. BMW of N. Am., Inc.*, 532 F.3d 511, 518 (6th Cir. 2008).  "Substantial similarity" requires that "the accidents

_____

[9] The plaintiff also cites extensively to an order from *Hayes v. MTD Products, Inc.* (another mower rollover case involving the same parties, filed in the Western District of Kentucky), which allowed the plaintiff to conduct discovery on issues that dated back to 1967, stating that the date "relates to the time when manufacturers first began to provide ROPS systems for lawn tractors and other agricultural equipment."  (Docket No. 164 Ex. C at 22.) Clearly, this order related to discovery, not admissibility, and, therefore, is not persuasive.

[10] It is well known but worth noting that "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. "Evidence which is not relevant is not admissible."  Fed. R. Evid. 402.  Despite the fact that evidence is relevant, it may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

must have occurred under similar circumstances or share the same cause." *Id.* Here, in large part, the rollover incidents depicted occurred decades ago in industrial equipment, such as forklifts, and, therefore, likely occurred in markedly different circumstances. (Docket No. 143 Ex. 1.).

Therefore, at this time, the court fails to see how this information will be relevant at trial, and, even if there were some sliver of relevance to the material, much of this information would likely be excluded under Rule 403, as misleading, confusing, and a waste of time. *See* Fed. R. Evid. 403.

**B.  Category Two - Writings Published After 1985 That Discuss "Unrelated" Accidents**

In Chart Two, the defendant provides a list of fifteen news articles and press releases, along with three "farm accident" injury reports, which range in publication date from March 1985 to August 2007, with the vast majority of the materials having been published this decade. (*See* Docket No. 143 Ex. 2.) These articles document other mower accidents, in which, in some cases, the rider was injured or killed when the mower "flipped," "overturned," or some other "freak" accident occurred. (*Id.*) The defendant argues that, "because the accidents are not substantially similar to the event in this case, the articles are irrelevant and inadmissible. ... These articles, and in particular any evidence concerning dissimilar incidents or accidents, constitute unfairly prejudicial evidence the probative value of which is marginal at best." (Docket No. 143 at 6.) Further, the defendant points out that, "because many of the documents include only vague descriptions of the accidents, it is unclear whether any involve a mower being operated in the manner at issue here." (*Id.* at 7.)

31

In response, the plaintiff largely falls back on the fact that *discovery* into arguably similar rollover incidents was permitted in the previous *Hayes* litigation.  (Docket No. 164 at 9-10.)  Again, whether information is discoverable is obviously distinct from whether that information is admissible.  The plaintiff also argues that the evidence of other rollovers is the "strongest evidence plaintiff has of the actual dangerousness of defendant's lawn tractors without ROPS under real world conditions," and, therefore, the court should not be swayed by defense contentions that this evidence would unduly distract the jury and delay the proceedings.  (*Id*. at 10.)

The court has conducted a review of the materials documented in Chart Two.  It does not appear that these materials, in and of themselves, could be useful to the plaintiff in establishing that "substantially similar" accidents had taken place.  In large part, these exhibits are simply brief news articles and press releases concerning an accident and, in some cases, the death of an individual riding a lawnmower.  (*See* Docket No. 143 Ex. 2.)  In general, these materials do not contain crucial details as to how or why the accident occurred, what type of mower was being used, or the other pertinent information that would be required to show substantial similarity.  (*Id*.)  Plainly, if the plaintiff is able to determine that the accidents discussed in the news articles were substantially similar, he would, assuming the evidence was admissible under Rule 403, be permitted to offer testimony regarding those accidents.  And again, not knowing which exhibits the plaintiff might intend to use, it is not worthwhile to explore each exhibit in detail.  That said, at this time, it does not appear that the articles described in Chart Two would be admissible, in and of themselves, to show substantial similarity.

32

**C.     Category Three - Writings Published After 1985 Regarding Other Industrial, Commercial, or Agricultural Equipment**

In Chart Three, the defendant provides a list of forty-four articles, letters, publications, and similar documents that it contends "discuss unrelated equipment – industrial, commercial, or agricultural equipment – instead of the residential riding mower at issue," and, therefore, are irrelevant.  (Docket No. 143 Ex. 3; Docket No. 143 at 9.)  In a brief discussion, the defendant cites the *Wolfgram* case discussed above, in which the court determined that material was not "probative since its applicability appeared to be limited to industrial machinery rather than consumer products."  (Docket No. 143 at 9.)  The defendant argues that, contrary to the plaintiff's suggestion, simply because all "wheeled vehicles can be turned over" that does not mean they are substantially similar.  (Docket No. 143 at 9.)  The plaintiff argues that this information is relevant to show that ROPS have been successfully used on all sorts of equipment, including tractors, although the plaintiff concedes that the exhibits regarding all-terrain vehicles and compactors would be likely irrelevant. (Docket No. 164 at 12.)

The exhibits documented in Chart Three are particularly dense and lengthy.  Given the parties' rather scant briefing on this topic, the plaintiff's concession that some of this material is irrelevant, the plaintiff's vagueness on what materials he might actually offer at trial, and the standards for substantial similarity discussed above, it is certainly not worthwhile to engage in an extensive evaluation of this material at this point in time.  That said, the fact that ROPS may have been used on dissimilar vehicles does not seem particularly probative, particularly because the plaintiff can point to other, much more similar vehicles that have used ROPS.

**D.     Category Four - Writings That Are "Inherently Unreliable"**

In Chart Four, the defendant provides a list of twelve magazine and Internet articles, a few research reports, and one letter to the plaintiff's attorney. (Docket No. 143 Ex. 4.) The defendant contends that these are "informal 'publications' about riding mowers consisting largely of Internet publications and newspaper or magazine articles." (Docket No. 143 at 9.) Further, the defendant claims that "the majority of such publications are hearsay and fail to meet the learned treatise exception to the hearsay rule. They were not drafted by either party nor the parties' witnesses. No one involved with this case has vouched for the accuracy or reliability of these publications." (*Id.*)

In response, the plaintiff contends that their expert, Mr. Berry, "recognized" these documents as reliable in his expert report. (Docket No. 164 at 12.) Further, the plaintiff contends that "nothing precludes plaintiff from questioning defense experts with regard to said articles if they or the Court recognize same as a reliable authority." (*Id.*)

The plaintiff essentially concedes that the documents in Chart Four are hearsay, but, in citing Federal Rule of Evidence 803(18), indicates that they are admissible under the "learned treatise" exception to the hearsay rule. (*Id.*) Under the learned treatise exception, "statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice" may be read into evidence, although they may not be received into evidence. Fed. R. Evid. 803(18). The use of such materials is limited to the situation in which the material is "called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination." *Id.*

34

It is the burden of the proponent of the material to show that the material fits within the learned treatise exception to the hearsay rule. *See Maggipinto v. Reichman*, 481 F. Supp. 547, 550 (E.D. Pa. 1979). At this stage, the only support the plaintiff offers for the conclusion that these materials (which are largely newspaper, magazine, and Internet articles) are "learned treatises" is that, his expert, Mr. Berry, in conjunction with his expert report, provided a bibliographic list of hundreds of supposedly "reliable" authorities, of which the articles in Chart Four were apparently included. Therefore, other than the plaintiff's conclusory assertion, there has been nothing presented to show that these specific materials fall within the learned treatise exception, and arguing that some of these materials could possibly constitute a learned treatise strikes the court as bizarre. In light of the fact that, once again, the plaintiff is vague about which articles he may actually use at trial, it suffices to say that, at this point, the plaintiff has failed to show why these materials are admissible.

### E.    Category Five - Evidence of Competitor Products

In Chart Five, the defendant lists 406 "advertisements describing other manufacturers' industrial, commercial, or residential lawn care equipment." (Docket No. 143 Ex. 5; Docket No. 143 at 11.) As the defendant describes it, "also included are articles not about lawn equipment at all – some are publications on farm tractors, construction equipment, fork lifts, and roller compactors. Of the 406 documents, 99 concern industrial, commercial, or turf care equipment. The remaining 307 documents were published by MTD's competitors to describe a variety of other products." (Docket No. 143 at 11.) The defendant contends that, in light of Tennessee law that holds that the "relevant question is always whether the actual product designed and produced is unreasonably dangerous," the plaintiff's position that competitors may have

produced a "better" device is not relevant to whether the mower at issue here was defective, or the evidence is of such limited probative value that it should be excluded under Rule 403. (*Id.* quoting *Brown*, 318 F. Supp. 2d at 599).

In response, while again not citing specific documents that it intends to use at trial, the plaintiff implies that some of this evidence could be used to show that similar mowers, of similar weight, did employ the ROPS, and, therefore, this evidence could go to show that a ROPS was widely used in the industry on mowers similar to the mower at issue here. The plaintiff argues that this would implicate many issues in this case, including whether the mower was defective, whether a ROPS was feasible on this mower, and so forth. (Docket No. 164 at 13-15.) The plaintiff states that he intends to use this evidence "to establish that the majority of defendant's competitors do in fact offer ROPS as standard or optional equipment" on similar models. (*Id*. at 16.)

In its reply, the defendant does not quibble that competitor information may be relevant, under certain circumstances, as evidence of, among other things, the feasibility of an alternative design. (Docket No. 178 at 11.) The defendant presses the point, rather, that the plaintiff "makes no effort to demonstrate that any particular product described in any particular exhibit is, in fact, relevant." (*Id*.) The defendant argues that much of the material in Chart Five concerns vastly different types of equipment from the mower at issue here and also equipment that, even if a mower with ROPS, only had a ROPS because it was significantly heavier than the mower here. (*Id.*)

Under Tennessee law, in determining whether a product is unreasonably dangerous or defective, "[c]onsideration is given" to the "customary designs, methods, standards and

techniques of manufacturing, inspecting, and testing by other manufacturers or sellers of similar products." Tenn. Code Ann. § 29-28-105(b). Obviously, it makes no sense at this point to try to assess which products in Chart Five are "similar products" and which are not, particularly because the plaintiff has not indicated which of these materials he might use at trial. That said, in this context, a relevant "similar product," is likely one that shows that the defendant could have eliminated the alleged "unsafe character" of the product at issue without "hindering its usefulness" for the task performed or eliminating or dramatically reducing the practicality of the product. *See Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 282 (Tenn. 2005).

## F. Category Six - Government Reports of Dissimilar Accidents

In Chart Six, the defendant provides a list of 159 government reports "concerning lawn tractor accidents and data" compiled by a governmental agency "about accidents not involving the product at issue." (Docket No. 143 Ex. 6; Docket No. 143 at 14.) These reports range from CPSC reports of "lawn tractor rollover accidents" over a twenty-five year period to a single death certificate or photograph from an accident scene. (Docket No. 143 Ex. 6.) Similar to its argument above, the defendant contends that these reports of other accidents are not admissible unless they meet the requirements of substantial similarity; that is, "the reports must still involve the same type of residential riding mower, the same type of use, and the same conditions at issue in this case." (Docket No. 143 at 14.) The defendant states that none of the reports appears to involve the mower at issue, and, therefore, the evidence should be excluded under the "substantial similarity" test. (*Id.*)

In response, the plaintiff states, again, that this court should follow the alleged reasoning of the *Hayes* order regarding discoverability, as the defendant "chooses to ignore the common

facts that each rollover involved the law of gravity causing a rollover of a riding mower without a ROPS, resulting in injury or death of the operator." (Docket No. 164 at 17.) Once again, that order dealt with discoverability of materials, not admissibility.

The court's previous discussion of substantial similarity applies here as well. A basic review of the material submitted by the defendant indicates that there is little from these documents themselves by which the plaintiff could establish substantial similarity. The material often appears vague and incomplete about the type of mower used and provides little basis to believe that the incident here was substantially similar. Also included in these materials are obviously inappropriate autopsy pictures and other graphic matter. Further, many of the accidents appear dissimilar, involving a mower sliding and tipping rather than flipping over. Again, it is not worthwhile to undertake a document-by-document discussion; suffice it to say that much of this material, if not all, appears inadmissible because the material does not provide information by which one could conclude that a "substantially similar" accident took place.

### G. Category Seven - Government Reports, Standards, or Regulations Not Applicable to Cub Cabet Z-Force

In Chart Seven, the defendant provides a hodge-podge of twenty-one government reports, including reports of meetings of the National Safety Council, various OSHA standards and CPSC proposed rules. (Docket No. 143 Ex. 7.) The defendant argues that "government publications describing safety standards or regulations applicable to agricultural or industrial equipment other than mowers like the [mower at issue] should be excluded as irrelevant and unfairly prejudicial." (Docket No. 143 at 15.) The defendant argues that standards do exist for the mower at issue, and, through the evidence in Chart Seven, the plaintiff would attempt to

38

confuse the safety standards and regulations for other, dissimilar products with the safety standards for the mower at issue. (*Id.*) In response, the plaintiff argues that reports, particularly from the CPSC, are relevant because they "tend[] to make it more likely than not that it was unreasonably dangerous and also reckless to design the riding mower (lawn tractor) at issue without a ROPS to protect from rollovers." (Docket No. 164 at 17.) The plaintiff also argues that Mr. Berry has identified the reports as "reliable authorities." (*Id.*) As discussed above, Mr. Berry's assertions as to reliability do not make the document admissible.

Again, the plaintiff does not state which specific exhibits he might seek to use at trial, and, therefore, this issue, like most of these issues, is premature. That said, the plaintiff appears to seek to use some of this information to establish that riding mowers were considered potentially dangerous by the CPSC as early as the late 1970s, and that deaths and injuries from rollovers have been a constant source of concern since that time. (Docket No. 164 at 17.) Plainly, while that evidence is certainly not conclusive of whether the mower at issue here is unreasonably dangerous or defective, the plaintiff is certainly entitled to "set the scene," as it were as to what knowledge about the risks of riding mowers was available at the time of the injury here. It is not clear to the court that many of the documents attached in Chart Seven would reasonably help set that scene, however; some of the material dates back to the mid-1940s, and the defendant is rightfully concerned that the jury may become confused as to what government standards are relevant to the specific mower at issue. Again, the court makes no determination as to the admissibility of any particular document at this time, largely because, at least for this set of documents, the court believes that effective trial preparation by the plaintiff

39

would ferret out which documents it was reasonable to use to establish the state of knowledge discussed above.

### H. Category Eight - Government Publications on Other Products

In Chart Eight, the defendant provides a short list of six documents, published by government agencies, that appear to report on safety concerns related to large-scale agricultural work. (Docket No. 143 Ex. 8; Docket No. 143 at 15.) The defendant contends that these materials do not have any relevance to the mower at issue here and should be excluded. (Docket No. 143 at 15.) In his response, the plaintiff does not directly confront the defendant's arguments about chart 8, instead using this general section of the response to discuss CPSC publications. (Docket No. 164 at 17.) Near as the court can tell, none of the materials in Chart Eight are CPSC reports; rather they range from reports by the U.S. Center for Disease Control to a report by the Government of South Australia. (*See* Docket No. 143 Ex. 8.) In light of the discussion above, the court fails to see how any of this material is relevant to the proceedings here.

### I. Category Nine - Government Contracts for Lawn Care Services

Chart Nine lists three contracts entered into between state governments and manufacturers of lawn care equipment. (Docket No. 143 Ex. 9.) Two of the contracts are between Kansas and multiple manufacturers of lawn, yard, and garden equipment, and the other contract is between the state of New York and manufacturers of lawn care equipment. (*See id.*) MTD is a party to some of the contracts; that is, MTD appears to be agreeing to sell its mowers to the state for the state's use. The defendant argues that "these contracts are not evidence of anything, and the circumstances or negotiations underlying the contract" are either unknowable

or not reasonably ascertained. (Docket No. 143 at 16.) In a brief response, the plaintiff argues that, because the contracts include the precise model of mower at issue here, the contracts show that the mower at issue here was used in circumstances other than in a residential, homeowner situation. (Docket No. 164 at 18.) Without more, the court agrees with the defendant that the contracts are not really probative of anything because the contracts do not establish how the mowers at issue were used; that is, simply because a state buys a certain type of mower does not indicate that the mower was used in a particular situation. In and of themselves, therefore, the contracts do not appear relevant.

**J.      Category Ten - Patents for Products Not Made by MTD**

In the final chart, the defendant lists eighteen patents, many of which are more than thirty years old. (Docket No. 143 Ex. 10.) The defendant contends that "seventeen patents describe features applicable to industrial or agricultural equipment, and only one of the patents is applicable to a residential riding mower. . . . None of the patents – including the one applicable to a residential riding mower – was designed, created, or prepared by MTD or relate to" the mower at issue here. (Docket No. 143 at 16.) The defendant argues that "these patent applications are irrelevant to any fact at issue in this case," and, even if slightly relevant, they should be excluded under Rule 403. (*Id*. at 16-17.) In response, the plaintiff states that the evidence is relevant to: "(1) show the extent of the rollover hazard and (2) the fact that ROPS have been in existence for years for all designs of tractors, including lawn tractors." (Docket No. 164 at 18.) In short, the plaintiff appears to be using these patents to show that the technology that it claims should have been present on the mower at issue (the ROPS and an inclinometer) has been readily available for many years. (*Id*. at 18-19.) In its reply, the defendant notes that it

41

"does not deny the existence of ROPS, nor does MTD deny the existence of inclinometers," and, therefore, the true purpose of this evidence must be to create the "illusion" that "all tractors" other than the one in this case have inclinometers and ROPS. (Docket No. 178 at 14.)

As discussed earlier, the plaintiff is plainly entitled to show that "similar products" eliminated the alleged "unsafe character" of the product at issue without "hindering its usefulness" and practicality for the task performed. *See Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 282 (Tenn. 2005). Again, the plaintiff has not indicated which patents he might attempt to introduce at trial, and even a basic review of the patents indicates that the products therein may very well not be "similar products" to the product at issue here. Also, in light of the fact that the defendant does not dispute that ROPS and inclinometer technology was widely available at the time of the manufacture of the mower here, the practical value of introducing more than a dozen arcane, and potentially confusing, patents to the jury seems remote at best.

## VII. Motion in Limine [Re: ROPS]

Finally, the plaintiff has also moved, *in limine*, to exclude any mention by the defendant at trial that the mower at issue would have been more dangerous or potentially injurious if the mower had a ROPS installed. (Docket No. 174 at 1.) The plaintiff notes that two engineering experts for MTD, Guenter Plamper (who is an "in house" engineering expert for MTD) and Jimmy Eavenson (who designs ride-on outdoor power equipment and works for a wholly owned subsidiary of MTD) have both indicated in their depositions and elsewhere that they intend to testify that it would have been more dangerous and potentially injurious for the mower at issue in this case to have had a ROPS installed. (Docket No. 175 at 3-10.) The plaintiff argues that all such testimony should be excluded at trial.

42

The plaintiff argues that the defense theory that the mower in this case would have been more dangerous with a ROPS is "unsupported by any documented empirical evidence," which, the plaintiff argues, all points to mowers with ROPS devices being safer than mowers without those devices. (*Id.*) The plaintiff argues that, to the extent this theory were offered at trial, it would only be based on the defendant's self-serving desire to avoid liability and not based on the facts, and, therefore, the testimony should be excluded as not the product of "reliable principles and methods," as required by *Daubert*. (*Id.* at 11 citing Fed. R. Evid. 702.)

In response, the defendant primarily argues that the relief the plaintiff seeks, to preclude the defendant from offering this theory at trial, would "deprive MTD's employees [] the opportunity to describe their cost-benefit analysis on the subject of ROPS. . . . Plaintiff would have it that the jury only hear[] testimony about the supposed benefits of ROPS, without allowing MTD to present the drawbacks."[11] (Docket No. 180 at 1.) Consistent with this, it is clear from the record that Plamper, Eavenson and others at MTD responsible for the design of the mower, intend to testify that, when designing the mower at issue, among other things, they relied on principles of physics and common experience to come to the determination that it

--------------------------------

[11]While contending that this is not a *Daubert* issue, but rather an issue of the defendant's "state of mind" that it must be allowed to explain to the jury, the defendant does note that Mr. Plamper and Mr. Eavenson have more than 75 years of combined experience "in the outdoor power equipment industry," have relevant testimony to offer, and have come to this conclusion regarding ROPS in a reliable manner, that is, by drawing on their experience to interpret the discovery in this case, along with accident and testing data, manufacturer literature, and models. (Docket No. 180 at 2-7.) The defendant notes that this is essentially the same method used by any other expert in this case, and, furthermore, their position – that ROPS should not be employed on light weight mowers – is tacitly endorsed by government regulations that only require ROPS on heavier models than the mower at issue here. (*Id.* at 8-10.) In light of this, even if this motion only implicated *Daubert*, and not state of mind testimony, the court would not be favorably disposed to the plaintiff's position.

43

would be unwise to install a ROPS on mowers that were as relatively small as the mower at issue here.  (Docket No. 175 at 7-8; Docket No. 180 at 3.)

In his reply, the plaintiff, at substantial length, challenges the contentions of Plamper and Eavenson that the mower could possibly be safer without the ROPS, again arguing that no empirical data supports this position.  (Docket No. 184 at 1-10.)  In a brief section, the plaintiff argues that "fact" or "state of mind" testimony that a ROPS would make the mower at issue less safe should be excluded under Fed. R. Evid 403.  (Docket No. 184 at 11.)  That is, an alleged "end run" around *Daubert*'s relevancy and reliability requirements by presenting this testimony as "fact" testimony would be "vastly more prejudicial than probative in this case when there is simply no factual, empirical basis for the purported 'fact' opinions."  (*Id*.)

The plaintiff's motion will be denied.  Here, the plaintiff seeks to exclude, at trial, *any* defense "contention" that the mower at issue would have been safer without a ROPS.  (Docket No. 174.)  Granting this motion would implicate state-of-mind testimony from MTD officials (including, potentially, Plamper and Eavenson) as to why they made the design choices they made.  (Docket No. 180 at 3.)  Obviously, the defendant must be allowed to offer testimony as to why it made the design decisions it did, even if the plaintiff considers those decisions dubious. The plaintiff's argument that this testimony should be excluded under Rule 403 is plainly without merit, as rather than being unfairly prejudicial, confusing or misleading, such testimony is necessary for the jury to understand the defendant's decision-making process.  It would be far more confusing and misleading for the jury if this testimony were excluded and the defendant was not able to present its explanation for why it took the course of conduct that it did.

44

Therefore, the plaintiff is clearly not entitled to the relief he seeks here, and, therefore, this motion will be denied.

## CONCLUSION

For the reasons discussed herein, the defendant's Motion to Exclude Testimony of Kathy Ward will be granted, the plaintiff's Motion for Reconsideration will be denied, the defendant's

Motion In Limine to Exclude Irrelevant Exhibits will be denied as premature (with reservations), and the plaintiff's Motion In Limine [re: ROPS] will be denied.

The plaintiff's Motion for Sanctions will be granted in part and denied in part, and the plaintiff will be awarded $6,741.83. The defendant's Motion to Strike Untimely Expert Reports and to Exclude Testimony at Trial will be granted in part and denied in part; that is, the testimony of Dr. Karnes and Dr. Nichols will not be permitted at trial, and any costs associated with an additional deposition of Mr. Berry will be borne by the plaintiffs. The plaintiff's Motion for Extension of Time to Complete Discovery will be granted in part and denied in part; that is, this matter will be referred to Magistrate Judge Griffin for the limited purpose of coordinating the logistics of the "potentially destructive" testing of the mower at issue.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

46