IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| SHAWN JUAREZ CAMPOS a/k/a ASCENCION JUAREZ CAMPOS<br><br>Plaintiff,<br><br>v.<br><br>MTD PRODUCTS, INC.<br>d/b/a Cub Cadet,<br><br>Defendant. | Case No.: 2:07-CV-00029<br>Judge Trauger |

## MEMORANDUM

Pending before the court are ten motions *in limine* filed by the plaintiff, Shawn Campos, in advance of the April 13, 2010 trial of this matter. (Docket Nos. 199, 201, 203, 205, 207, 209, 211, 213, 215, and 218.) Each of these motions has been fully briefed, and the court's findings on each motion are discussed in more detail below.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a riding mower accident that rendered the plaintiff a paraplegic. The plaintiff, Shawn Campos, purchased a new Cub Cadet Z-Force 50 personal riding mower (the "mower") on September 9, 2005. The mower had a "zero-turning radius" ("ZTR") design. The mower did not have a roll bar and seatbelt, or what is also known as a roll over protection system ("ROPS"), and it also did not have a "slope indicator," which is also known as an "inclinometer." On August 19, 2006, Campos was riding the mower in his back yard in Carthage, Tennessee. After numerous passes around the yard, Campos was driving the mower

1

up a slope. At this time, the mower "jerked," flipped rearwards 180 degrees, and pinned Campos face-down to the ground, with the mower on his torso and lower body. As noted above, the accident has rendered Campos a paraplegic, unable to move from the waist down.

The plaintiff filed this lawsuit on June 26, 2007, alleging that the defendant, MTD Products, Inc. ("MTD"), was negligent and is strictly liable for selling a defective or unreasonably dangerous product. (Docket No. 1.) Trial was originally set for April 7, 2009, but, in March 2009, the trial was postponed to April 13, 2010.[1] (*See* Docket Nos. 151 and 154.) In the meantime, there has been considerable motion practice in this case, with both sides filing a litany of motions directed at various evidentiary issues. The court has previously issued lengthy memoranda addressing these and other motions. (Docket Nos. 128 and 187.) The plaintiff's ten motions *in limine* primarily focus on excluding various specific items of expert testimony from the trial.

## ANALYSIS

**I.    Motion to Exclude Evidence of Non Rollover Related Safety Devices on MTD Lawn Tractors (Docket No. 199)**

This motion concerns whether the defendant should be permitted to put on evidence, primarily through its engineering expert/VP of Engineering and Product Development Guenter Plamper, of non-ROPS related safety improvements on the mower. (*See generally* Docket No. 200.) The plaintiff contends that evidence of such improvements, such as MTD's pioneering "no mow in reverse" (NMIR) system, are "collateral matters" that have nothing to do with the primary issue in this case, which is whether the mower was defective because it lacked a ROPS

---

[1] The trial was continued by the court, due to unavoidable conflicts unconnected with this case. (*See* Docket No. 151.) The length of the continuance was due to the schedules of counsel and various expert witnesses.

and an inclinometer. (Docket No. 200 at 2-4.) The plaintiff argues that this evidence should be excluded as irrelevant under Fed. R. Evid. 402 or, failing that, excluded under Fed. R. Evid. 403, as consideration of this evidence would result in a waste of time, unfair sympathy for the defendant, and jury confusion. (*Id.* at 5-6.)[2]

In response, the defendant argues that, as has often been the case in this litigation, the plaintiff's concerns here stem from events that occurred in a previous trial, that is, *Hayes v. MTD Products, Inc.* (W.D. Ky), which was a similar mower rollover case involving the same defendant and the same plaintiff's counsel. (Docket No. 227 at 2.) In *Hayes*, Plamper briefly testified that he was responsible for designing the NMIR feature and that this feature had been a major safety advance. (Docket No. 200 Ex. A at 3.) During closing argument, defense counsel also briefly mentioned the NMIR device to show the "bigger picture," which, according to defense counsel, indicated that MTD took care to put a safe product on the market. (Docket No. 200 Ex. B at 3.)

The defendant contends that Plamper should be permitted to offer similar testimony in this trial because it is "relevant to explain his engineering judgment," that is, to explain how MTD made trade-offs in terms of safety features and to explain how the mower works "as a whole." (*Id.* at 5-8.) The defendant further argues that the fact that Plamper was responsible for the NMIR feature is relevant to his credibility and credentials as an expert, and, contrary to the

---

[2]It is well known but worth noting that "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. Despite the fact that evidence is relevant, it may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

3

plaintiff's "waste of time" argument, as in *Hayes*, the explanation of the innovation and the technology would not consume more than a few minutes. (*Id.*) Finally, the defendant argues that the NMIR evidence is relevant to the plaintiff's punitive damages claim. That is, evidence of safety advances would be necessary to challenge the plaintiff's argument that the defendant's conduct in allowing this mower to go to market was "egregious." (*Id.* at 9-10.)

In his reply, while essentially rehashing his previous arguments, the plaintiff "concedes that Defendant is entitled to establish Mr. Plamper's qualifications and that Mr. Plamper may even go so far as to testify that he was instrumental in pioneering [the NMIR] feature." (Docket No. 243 at 5.) The plaintiff argues, however, that the defendant should not be allowed to argue that the product was reasonably safe because of its non-ROPS safety advances. (*Id.* at 6.) The plaintiff contends that this line of reasoning extends to the punitive damages claim, that is, it could be "egregious" not to install a ROPS on the mower, no matter the other safety improvements. (*Id.*)

The Tennessee Products Liability Act defines "unreasonably dangerous" as "a product [that] is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or [a] product [that] because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer . . . assuming that the manufacturer . . . knew of its dangerous condition." T.C.A. § 29-28-102(8). Therefore, the question of whether a product is "unreasonably dangerous" necessarily must, to some degree, consider the manufacturer's design of the product as a whole, and it would be unfair to the defendant to make it justify its safety choices in pure isolation, based only on what the plaintiff alleges made the product unsafe. *See*

4

*Brown v. Raymond Corp.*, 318 F. Supp. 2d 591, 599 (W.D. Tenn. 2004) ("The relevant question is always whether the actual product designed and produced is unreasonably dangerous.").

While the evidence at trial will undoubtedly focus on the ROPS (or lack thereof) and must not devolve into an unfocused discussion of the mower's general characteristics, the defendant should be permitted to explain how its product works and the features thereof. This was apparently effectively and reasonably accomplished in *Hayes*, and there is no reason to think the same could not be accomplished here. This motion will be denied.

**II.     Motion to Preclude Defendant from Presenting Anecdotal Evidence or Argument that Most Operators with ROPS on the Machine have Foldable ROPS and those ROPS are in the Down Position (Docket No. 201)**

This motion is also based upon Plamper's testimony in *Hayes*, during which he stated that, from his personal observations, it was "a lot" more common to see operators who use a ROPS-installed mower employ the ROPS in the "folded down" position, whereby it provides no protection, than to see those operators using the ROPS in the active position. (Docket No. 202 Ex. A. at 4.) Plamper conceded during his *Hayes* testimony that he had no study or official statistics to back up his statements. (*Id.*) The plaintiff argues that Plamper's personal observations are "ancedotal," "fundamentally unreliable" and, therefore, not appropriate expert testimony under the *Daubert* standard.[3] (Docket No. 202 at 3.)

---

[3] It is well known but worth noting that, under its "gate-keeping" role established by Fed. R. Evid. 702, a trial court must evaluate the relevance and reliability of all expert testimony, whether the testimony offered is "scientific" or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)(*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993)). In this role, the court's fundamental objective is to generally evaluate, based upon whatever factors are important in the particular case, the relevancy and reliability of the testimony. *Id.* at 151. That is, the court is to ensure that the proffered testimony is reliable and relevant and that the expert, whatever his field, "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

While it walks through the *Daubert* analysis, the defendant also argues that this particular issue does not implicate Plamper's standing as an expert under *Daubert*. (Docket No. 221 at 6.) That is, Plamper was intimately involved in the design process of the mower, and, as the court stated in the previous Memorandum, "the defendant must be allowed to offer testimony as to why it made the design decisions it did, even if the plaintiff considers those decisions dubious." (Docket No. 187 at 44.) Therefore, Plamper should be allowed to testify that one reason he designed the mower without a ROPS was his personal observation that the ROPS was rarely deployed. In his Reply, the plaintiff states that he does not seek to bar Plamper from testifying as to his personal observations or even from testifying that he has seen "many instances" of the ROPS being folded down, but he simply seeks to exclude Plamper from stating that "most" users employ their ROPS in the "folded down" position, because there is no way Plamper could know what "most" operators do. (Docket No. 235 at 2.)

As the plaintiff recognizes, it does not appear from the defendant's response that Plamper intends to testify that "most" operators employ a folded-down ROPS, but, rather, he will testify that he has observed that, in "many instances," operators use a folded-down ROPS. (Docket No. 221 at 13-14.) The plaintiff apparently does not object to this testimony, and there does not appear to be an active dispute here. Therefore, the motion will be denied as moot.

**III.    Motion to Exclude Evidence of Previous DUI and Lost Driver's License, Bankruptcy, and Driving Without a License (Docket No. 203)**

In this motion, the plaintiff seeks to have excluded any reference to the fact that the plaintiff's wife had incurred a DUI, a revoked driver's license, and a bankruptcy, or to the fact that, during his deposition, the plaintiff testified that he had, in the past, driven without a valid driver's license. (Docket No. 204.) In its response, the defendant stated that, pursuant to the

6

court's previous rulings on related evidentiary issues, it does not intend to offer testimony or evidence regarding the plaintiff's previous driving problems, and, additionally, it does not intend to offer evidence regarding Ms. Campos' DUI, driving issues, or bankruptcy. (Docket No 222 at 3.) As there is no active dispute here, this motion will be denied as moot.[4]

## IV. Motion to Exclude Certain Opinions of Defendant's Expert Jimmy Eavenson Regarding ROPS and All Terrain Vehicles (ATVs )(Docket No. 205)

In his expert report, referring to the conclusions of another study (known as the "SAE Report"), the defendant's engineering expert Jimmy Eavenson stated that the use of ROPS on all-terrain vehicles ("ATVS") had a "negative . . . net safety impact." (Docket No. 206 Ex. A at 6.) Using ATVs as an example of a lightweight vehicle, like the mower, Eavenson went on to state that any "design change" involving ROPS as to this mower should be evaluated "very carefully." (*Id.*)

The plaintiff contends that ATVs and the mower are not comparable machines, and, therefore, Eavenson should not be allowed to testify as to this comparison at trial. (Docket No. 206 at 3-7.) Specifically, the plaintiff argues that the evidence is not relevant under Rule 401 because these "are not similar machines at all," in terms of either purpose or design. (*Id.*) Additionally, the plaintiff argues that, even if the comparison is somehow relevant, it should still be excluded under Rule 403 because it would result in a collateral and wasteful discussion of the design and purpose of ATVs. (*Id.* at 7-8.)

---

[4]The plaintiff contends that, because the defendant "confessed" to the merit of the plaintiff's motion, the motion should be granted and not denied as moot. (Docket No. 236 at 2.) As far as the court can tell, the defendant has not confessed to the merits of any of the plaintiff's motions, but has, at times, simply said that it does not intend to use the evidence at issue. When there is no dispute meriting the motion, the issue is moot and the motion will be denied as such.

7

In response, the defendant argues that, as is clear from his report, Eavenson was not attempting to compare ATVs and lawn mowers but was simply making a general statement that, from previous experience, he has determined that ROPS are not a "panacea" for the safety problems of lightweight vehicles. (Docket No. 223 at 3-5.) Also, consistent with the court's earlier statement that "the defendant must be allowed to offer testimony as to why it made the design decisions it did, even if the plaintiff considers those decisions dubious," the defendant argues that Eavenson, who, like Plamper, was involved in the design of the mower, should be allowed to opine on the influences behind the design decisions, one of which was the SAE Report, which was published more than a decade prior to the sale of the mower. (*Id.*)

On balance, the plaintiff is making too much of this issue. It is clear from Eavenson's expert report that he is not equating ATVs and the mower, and he is not attempting to argue that what is good for one is irrefutably good for the other. Rather, as can be seen from the plain text of his report, he simply saw the SAE Report's discussion of ROPS as one relevant factor in the design calculus. Clearly, to the extent that this information was considered by MTD in terms of whether to put a ROPS on the mower at issue, that evidence is relevant.

That said, in his testimony, Eavenson will, as he does in his expert report, have to focus on why a ROPS was not a wise design choice for the mower. So long as the testimony regarding ATVs is kept within the narrow channels discussed by the defendant here and the testimony does not devolve into a lengthy discussion of the character of ATVs and other dissimilar lightweight machines, the court sees no potential for the jury to be confused or for time to be wasted by what is, in reality, fairly simple testimony. Therefore, the plaintiff's motion will be denied.

**V.     Motion to Preclude Defendant from Presenting any Evidence or Argument with Respect to its Success Rate in Product Liability Suits (Docket No. 207)**

Citing Rules 402 and 403, the plaintiff moves to prevent the defendant from introducing any evidence or argument "with respect to outcomes from other product liability cases or litigation involving the lawn tractor at issue in this case." (Docket No. 208 at 1.) The impetus for this motion, again, was a small piece of Plamper's testimony in *Hayes*, in which, in response to a question from plaintiff's counsel regarding other rollover lawsuits faced by MTD, Plamper stated that "[w]e are [] winning 90 percent of our cases." (Docket No. 208 Ex. A at 3.) The plaintiff contends that such testimony is irrelevant and improper, and, in support of this position, the plaintiff cites numerous cases holding that questioning and argument regarding prior, similar cases is improper. (Docket No. 208 at 4)(citing, among others, *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3rd Cir. 1975)). The plaintiff also argues that, because Plamper has previously claimed that MTD "destroyed records of prior litigation," he could not possibly know MTD's success rate. (*Id.* at 6.)

In response, the defendant notes that Plamper offered the testimony at issue in *Hayes* spontaneously and only in response to plaintiff's counsel's "opening the door" to such testimony by raising the issue of prior litigation. (Docket No. 224 at 2.) The defendant recognizes that "the introduction of evidence concerning the existence of prior litigation is inappropriate," and argues, in essence, that so long as plaintiff's counsel does not open the door to this issue, similar testimony will not recur. (*Id.* at 6-8.) In his reply, the plaintiff "agrees to not raise MTD's prior litigation history unless same is necessary to impeach Defendant's witnesses or unless Defendant's witnesses open the door." (Docket No. 238 at 2.) Therefore, it appears that both parties have agreed to leave this particular door closed, and, therefore, the plaintiff's motion will be denied as moot.

## VI. Motion to Exclude Certain Opinions of Harry L. Smith, M.D., Ph. D., Contained in his Expert Report (Docket No. 209)

Here, the plaintiff moves to prevent defense medical expert, Dr. Harry Smith, from testifying as to certain, previously expressed opinions. (Docket No. 210 at 1.) Specifically, the plaintiff seeks to preclude Dr. Smith from opining, as he did in his expert report, that Campos was under the influence of alcohol at the time of the accident and that this impairment resulted in poor judgment leading to the accident. (Docket No. 210 Ex. A at 8.) The plaintiff does not appear to challenge Dr. Smith's ability or qualifications to render his other opinions, including that the accident resulted from the plaintiff's ascending too steep a slope and that a ROPS would not have prevented the injuries associated with the accident. (*Id.* at 8-9.)

It is clear from his deposition and his report that Dr. Smith came to his challenged conclusions (1) by applying his general "education, experience, and training" as a physician, including his nine years (1978-1987) of experience as an emergency room physician, (2) by noting the general circumstances of the accident, (3) and by crediting a few pieces of circumstantial evidence, most notably an emergency room report that noted that Campos had consumed alcohol on the day of the accident and a report made by a member of the LifeFlight team that noted that the plaintiff had the smell of alcohol on his breath two hours after the accident. (*Id.*; Docket No. 210 Ex. C at 113.) It is also clear that Dr. Smith did not do any independent research into this issue, conduct any independent testing, or perform any experiments in conjunction with generating his opinion. (Docket No. 210 at 3-10.)

The plaintiff argues that this opinion should be excluded as unreliable under *Daubert*. That is, "Dr. Smith simply does not have enough information to support his opinions that Mr.

10

Campos was impaired on the date of the accident much less that same was a cause of the accident." (*Id.* at 11.) That is, outside of a few pieces of weak circumstantial evidence of some level of alcohol consumption, there is no support for the notion that the plaintiff was intoxicated at the time of the accident, let alone so impaired that the intoxication caused the accident. (*Id.* at 13.) As summarized by the plaintiff: "[i]f Dr. Smith cannot tell how impaired Mr. Campos was, it defies explanation how he can say the impairment was enough to cause the accident." (*Id.* at 14.) Therefore, the plaintiff argues, Dr. Smith's testimony on this point is nothing more than an impermissible "personal belief or opinion" dressed up as expert testimony with "too wide" an "analytical gap" between the inferences drawn and the evidence presented. (*Id.* at 17.)(quoting *Turpin v. Merrell Dow Pharmaceuticals*, 959 F.2d 1349, 1360-61 (6th Cir. 1992)).

In response, the defendant argues that Smith's opinions on the matter are reliable and his methods are trustworthy. (Docket No. 228 at 4.) The defendant notes that Dr. Smith is a physician with more than thirty years of experience, including nine in the emergency room, and, therefore, he has the ability to reliably review the entire record from a motor vehicle accident and then render an opinion as to whether the circumstances of the accident indicate that the operator of the vehicle was impaired. (*Id.* at 6.)

Also, the defendant argues that these opinions are "trustworthy," in the sense that they are derived from "valid methods, principles, and reasoning." (*Id.* at 8.)(citing *U.S. v. Bonds*, 12 F.3d 540, 556 (6th Cir, 1993)). Indeed, the defendant argues, under *Bonds* and related cases, the court is to focus on the "principles and methodology underlying the testimony," not whether the court agrees with the result reached by the expert. (*Id.*) That is, whether or not the court agrees with Dr. Smith's conclusions, it must agree that reviewing medical records, witness accounts,

11

and the facts of an accident is a reasonable and trusted method by which to come to the conclusion reached here. (*Id.*)

While the court agrees with the plaintiff that there is a considerable analytical leap in Dr. Smith's testimony, this goes to the weight of his testimony, not its admissibility. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008)("an expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere weaknesses in the factual basis of an expert witnesses' opinion . . . bear on the weight of the evidence rather than on its admissibility.")(internal quotation and citation omitted). That is, on cross examination, the plaintiff will have the opportunity to make various challenges to Dr. Smith's conclusions of impairment, including pointing out the absence of any blood alcohol test and the lack of evidence of alcohol consumption at the scene. However, in light of Dr. Smith's experience, the evidence used to support his opinion, and the reasonable and straightforward methodology he employed in this case, there is no basis to exclude his opinion here. Therefore, the plaintiff's motion will be denied.

**VII.    Motion to Exclude the Opinion of Joshua Lambert (Docket No. 211)**

Joshua Lambert observed the accident from in front of a friend's house and testified at his deposition that, at the time of the accident, the plaintiff was mowing a "pretty steep hill" and that, at that time, he thought that the plaintiff's conduct was "dumb." (Docket No. 212 Ex A at 15-16.) While, in his initial briefing, the plaintiff sought to preclude Lambert from testifying as to either of these opinions, the plaintiff has narrowed his objection and now only objects to Lambert's testifying that the plaintiff's pre-accident conduct was "dumb." (Docket No. 241 at 1.)

The plaintiff argues that Lambert's opinion is irrelevant and not, as required, based upon personal knowledge because Lambert does not know anything about mowing or about the specifics of the hill at issue. (Docket No. 212 at 5.) Also, given Lambert's lack of mowing experience, the plaintiff argues that his opinion cannot be considered "helpful to . . . the determination of a fact in issue," as required for lay witness opinion testimony to be permissible under Fed. R. Evid. 701. (*Id*.) If the statement is not to be excluded on these grounds, the plaintiff argues, it should be excluded under Rule 403 because it is a "personal insult" and a "personal attack" that places the plaintiff in a "poor light." (*Id.* at 6; Docket No. 241 at 4.)

First, the defendant notes that, in a prior Memorandum, the court concluded that Lambert's observations of the plaintiff's driving were admissible as to the issue of whether the plaintiff was impaired, and, therefore, the plaintiff's motion here should be considered and rejected as an improper Motion to Reconsider. (Docket No. 229 at 2-5.) Moreover, the defendant argues that Lambert's lay opinion testimony meets the two basic requirements of non-expert opinion testimony under Rule 701: (1) it is "rationally based on the perception of the witness" and (2) it is "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." (*Id.* at 5.)(citing Fed. R. Evid. 701). That is, based upon his perception that the hill was too steep to be mowing on, Lambert concluded that the plaintiff was being "dumb" and, based on the fact that Tennessee is a comparative fault state, Lambert's testimony on this point will aid the jury in determining whether the plaintiff was at fault for the accident, along with providing the jury with a better sense of where the accident occurred. (*Id.* at 6-9.)

13

Case 2:07-cv-00029   Document 246   Filed 01/14/10   Page 13 of 20 PageID #: 4774

The court can identify no basis for the exclusion of this testimony. This testimony is simply Lambert's recollections of what he thought while the plaintiff was riding the mower and will be taken as such by the jury. A witness to an accident is allowed to, and, inevitably will, testify as to what he was thinking as the accident took place, along with his impressions of how and why the accident took place. The jury will put this factual testimony in the context of all of the other testimony it will hear in this lengthy trial and not give it inappropriate weight. This motion will be denied.

## VIII. Motion to Exclude the Fact that OSHA has not Enacted Regulations Requiring ROPS on any Kind of Riding Mowers Including ZTRs (Docket No. 213)

In this motion, the plaintiff argues that the defendant should not be allowed to raise a lack of OSHA regulations directed toward riding mower manufacturers as evidence that the mower was reasonably safe. (Docket No. 214 at 3.) In his deposition, Eavenson testified as to this lack of regulation; that is, he testified that OSHA, which issues regulations regarding workplace conditions, had not issued any regulations governing how, or with what protections, equipment such as the mower should be used in the workplace. (Docket No. 214 Ex. A at 83-84.) Eavenson also testified that this lack of regulation was one factor, among many, that influenced MTD's design decisions as to the mower. (*Id.*)

First, the plaintiff argues that, under Tennessee law, the "rebuttable presumption" that a product is not unreasonably dangerous because it complies with certain types of "administrative regulation[s] existing at the time [the] product was manufactured," does not apply here because there was no relevant administrative regulation from OSHA. (Docket No. 214 at 3)(citing T.C.A. § 29-28-104). Moreover, the plaintiff argues, the Sixth Circuit has directly addressed the admissibility of OSHA regulations (or the lack thereof) in this context and has ruled that OSHA

14

only regulates employer/employee conduct, and "it is not intended to affect the civil standard of liability." Therefore, "to use OSHA regulations to establish whether a product is unreasonably dangerous is [] improper." *Minichello v. U.S. Industries, Inc.*, 756 F.2d 26, 29 (6th Cir. 1985). The *Minichello* court did go on to state that OSHA regulations are not *per se* excluded in all products liability cases, just that they can "never provide a basis for liability." *Id.*

In response, the defendant argues that there is a distinction between the "admissibility of the evidence and the refusal to instruct the jury about a rebuttable presumption," and that, as indicated above, *Minichello* does not provide for a *per se* ban on evidence regarding OSHA regulations in products liability cases. (Docket No. 225 at 3-4.) Additionally, in light of the fact that the lack of OSHA regulations was influential in its design decisions, the defendant argues that it should be allowed to submit this evidence, consistent with the court's earlier rulings. (*Id.*) Finally, the defendant contends that, to the extent that the plaintiff intends on introducing OSHA standards for heavier equipment, "Defendant should be entitled to inform the jury that none of these rules require ROPS on the ZTR at issue." (*Id.* at 5.)

In his reply, the plaintiff asserts that he only "seeks to prevent Defendant, through its witnesses or attorneys, from putting argument, testimony or inferences in front of the jury that its lawn tractor must not be unreasonably dangerous because OSHA supposedly has not enacted regulations . . . ." (Docket No. 239 at 1.) The plaintiff also notes that he "does not intend to introduce evidence with respect to OSHA standards and regulations in his case-in-chief." (*Id.* at 4.)

In light of this more limited argument, the plaintiff's motion will be granted. *Minichello* is clear: using OSHA regulations to establish the scope of liability in a products liability case is

15

improper. Therefore, the defendant may not put argument, testimony or inferences in front of the jury that the mower was not unreasonably dangerous because OSHA has not enacted regulations regarding residential lawn mowers. That said, consistent with Eavenson's testimony and the court's earlier rulings, the defendant is allowed to explain the bases of its design choices.

IX.     **Motion to Exclude the Opinions of Jimmy Eavenson Found at Page 2 of his September 30, 2008 Report (Docket No. 215)**

In his expert report, Eavenson discussed "a recent survey of traction-steer [ZTR] mowers in the turf care industry covering 1998 through 2003," and, according to Eavenson, that study found that there were only 18 accidents and eight deaths amongst the 342,000 mowers in use during that period. (Docket No. 216 Ex. A at 4.) Based upon industry estimates of annual average use ("AAU") that asserted that commercial ZTRs were used, on average, 500 hours per year and residential ZTRs were used, on average, 100 hours per year, this equated to a vanishingly low accident frequency of one accident per roughly 16 million hours of machine usage. (*Id.*) That is, one accident for every 1,808 *years* of *constant* ZTR use (not accounting for the roughly 450 leap years that would occur during that time span). Eavenson reported that the survey went on to conclude that most accidents occurred on "excessively steep slopes" and were the result of operator "poor judgment." (*Id.* at 4-5.)

The plaintiff argues that "the opinion that there was an accident frequency of [ZTR] lawn tractors of 1:15,846,500 hours of machine usage is not based on reasonably reliable data." (Docket No. 216 at 2.) Specifically, the plaintiff claims that the survey to which Eavenson refers was industry directed, did not include data from all ZTR brands, and only includes accidents that

16

were reported to, and then by, the manufacturers. (*Id.* at 3-6.) Additionally, the plaintiff contends that the AAU data is unsupported and inconsistent with Plamper's previous statement in *Hayes* that the average life expectancy of a residential ZTR was 10 years or 300 hours. (*Id.*) The plaintiff also puts forth his own statistics, which he argues show that, based upon hospital reporting data, the rate of injuries is much higher than Eavenson indicates. (*Id.*) Therefore, the ratio cited by Eavenson should be prohibited as it is, among other things, "grossly misleading." (*Id.*)

The defendant spills considerable ink defending the industry study generally, arguing that the data for the survey was gathered through close collaboration between the Consumer Products Safety Commission (CPSC) and the manufacturing defendants, and that, while not all brands are represented in the survey, the data does cover companies representing 85 percent of the ZTR market. (*See* Docket No. 230 at 11-14.) In his Reply, the plaintiff, keeping the argument narrowly directed at the ratio, argues that the type of concrete, finite statistic proposed here is not based on sufficient facts and data to justify its admission and would be "vastly more prejudicial than probative." (Docket No. 242 at 7.)

Based upon the plaintiff's narrow argument, the court will grant this motion and prohibit the use of this statistic/ratio under Rule 403. As is clear from Eavenson's report, the ratio is generated entirely by rough estimates and incomplete data. The product of these rough estimates and incomplete data, however, is a ratio that, facially, has the appearance of certainty and appears to proclaim that the possibility of an accident in this case was astonishingly low. Given the myriad of other ways in which the defendant can express its view that the risk and the cost of

17

a ROPS exceeded its benefit, it would be improper to allow evidence that provided such a false sense of certainty. Therefore, on this limited basis, the plaintiff's motion will be granted.

X.  **Motion to Exclude the Opinion of Guenter Plamper Regarding Increase in Accidents because of ROPS (Docket No. 218)**

Finally, in his expert report, Plamper estimated that installing a ROPS on the mower "would reduce the stability of the unit and would increase the frequency of tipover accidents by more than 25% . . . [and] a residential ZTR under 650 pounds and equipped with a ROPS will overturn approximately twice as frequently than a similar unit not equipped with a ROPS." (Docket No. 219 Ex. A at 9.) Arguing that this opinion should be excluded under *Daubert* and/or Rule 403, the plaintiff states that "there is no absolutely no data" to support Plamper's statistical opinions and, therefore, they should be excluded. (Docket No. 219 at 3.)

In response, the defendant contends that Plamper's estimate is based upon "a series of tests" that are described in his expert report and are documented on videos that were provided to the plaintiff in discovery. (Docket No. 226 at 3.) In his expert report, Plamper states that he "conducted a series of weights, measurements, and stability tests on an identical [mower] at MTD's test center," including tests in which the identical mower had a ROPS installed. (Docket No. 219 Ex. A at 9.) In his report, Plamper states that his testing demonstrated that the light weight of the mower would have resulted in a decrease in stability if a ROPS had been installed, which, in turn, he estimated would have resulted in at least a 25 percent increase in accident frequency, given the frequency with which the mower is used on slopes. (*Id.*) Based upon all of this, the defendant argues that the estimates challenged by the plaintiff are both relevant and reliable – relevant because they reinforce MTD's engineering judgment as to the ROPS and

18

Case 2:07-cv-00029   Document 246   Filed 01/14/10   Page 18 of 20 PageID #: 4779

reliable because they are based on the thorough weight and stability testing of an individual with decades of experience in the industry. (Docket No. 226 at 5-9.)

As indicated by the plaintiff's reply, the plaintiff is, once again, basically objecting to the use of a statistic here. That is, he is not objecting to Plamper's testifying as an expert or to Plamper's testifying to those matters that influenced design decisions. (Docket No. 240 at 3.) Rather, once again, the plaintiff is objecting to the defendant's offering its expert to testify as to these specific statistics. (*Id.* at 3-6.)

This testimony is significantly less objectionable than the Eavenson statistic discussed above. Indeed, Plamper's estimates are clearly just that, estimates and attempted quantifications of risk based upon his own research and analysis and his more than three decades of experience in the industry. Obviously, it is not possible to precisely quantify what Plamper perceives as the risk here, and the court, based upon its review of Plamper's report, does not believe that Plamper is attempting to do that. Rather, it appears that Plamper, based upon his research and experience, is attempting to provide a necessarily rough estimate to quantify the risk here. This does not run afoul of *Daubert* or Rule 403. Therefore, the plaintiff's motion will be denied.

19

## **CONCLUSION**

For the reasons discussed herein, the majority of the plaintiff's motions *in limine* will be denied. That said, the defendant may not put argument, testimony or inferences in front of the jury (1) that the mower was not unreasonably dangerous because OSHA had not enacted regulations regarding residential lawn mowers and (2) that, for ZTRs and other similar vehicles, there is an accident frequency ratio of the kind discussed herein.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge